## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| TERRY DEVOS, ADMINISTRATRIX OF THE ESTATE OF PATRICK BUTCHER<br><br>AND<br><br>SHELBY BUTCHER, AS MOTHER AND GUARDIAN OF PATRICK BUTCHER'S SOLE SURVIVING MINOR CHILD B.B.,<br><br>*Plaintiffs,*<br><br>v.<br><br>MICHAEL DEMARCO,<br><br>ERIC FEDRICK-FINN,<br><br>SUMMIT COUNTY,<br><br>RUTHANN PAULUS-BLAND,<br><br>JAMIE GIGLIO,<br><br>AND<br><br>SUMMIT PSYCHOLOGICAL ASSOCIATES,<br><br>*Defendants.* | |
| **COMPLAINT WITH JURY DEMAND** | |

### NATURE OF ACTION

1.      This action arises from the wrongful death of Patrick Butcher at the Summit County Jail, who died by suicide on October 12, 2020 because the Jail's corrections and mental-health staff were deliberately indifferent to Patrick's serious psychiatric needs, consistent with Summit County's failure to properly train staff in suicide prevention.

## PARTIES

2.     Plaintiff Terry DeVos is an individual who lives in Stow, Ohio. She is the surviving mother of Patrick Butcher and has been appointed administratrix of his estate by the Summit County Probate Court. A copy of the judgment entry appointing Ms. DeVos to administer Patrick's estate is attached as Exhibit 1.

3.     Plaintiff Shelby Butcher is an individual who lives in Lorain, Ohio. She is the former wife of Patrick Butcher and natural mother and guardian of Patrick's only surviving child, B.B., who was born of the marriage between Patrick and Shelby Butcher. Because B.B. is a minor child, Shelby Butcher is a Plaintiff in this matter to assert claims on behalf of B.B.

4.     Defendant Michael DeMarco is an individual who lives and works in Euclid, Ohio. In October 2020, he was employed by the Summit County Sheriff and worked as a corrections officer at the Summit County Jail. Defendant DeMarco was in uniform and acting under color of state law at all times relevant to this Complaint. He is a "person" under 42 U.S.C. § 1983.

5.     Defendant Eric Fedrick-Finn is an individual who lives in Akron, Ohio. At all times relevant to this complaint, including on October 12, 2020, he was employed by the Summit County Sheriff and worked as a corrections officer at the Summit County Jail. Defendant DeMarco was in uniform and acting under color of state law at all times relevant to this Complaint. He is a "person" under 42 U.S.C. § 1983.

6.     Summit County is a political subdivision and local-government unit organized under the laws of Ohio and acting under color of law. The County is a "person" under 42 U.S.C. § 1983 and was at all relevant times the employer of Defendants Michael

DeMarco and Eric Fedrick-Finn. Defendant Summit County operates and is responsible for the Summit County Jail ("the Jail"), where it is obligated to train and supervise its employees and is liable for acts and omissions caused by its customs, policies, patterns, and practices.

7. Defendant Ruthann Paulus-Bland is an individual who lives in Tallmadge, Ohio. At all times relevant to this complaint, she was employed by Summit Psychological Associates as a clinical supervisor and/or assistant clinical director for services provided at the Summit County Jail.

8. Defendant Jamie Giglio is an individual who lives in Lima, Ohio. At all times relevant to this complaint, she was a psychology intern working with Summit Psychological Associates at the Summit County Jail. On information and belief, Ms. Giglio was employed by Summit Psychological Associates during her internship.

9. Summit Psychological Associates, Inc. is a private for-profit corporation that, at all relevant times, provided services at the Summit County Jail under a contract with the County of Summit Alcohol, Drug Addiction & Mental Health Board ("the ADM Board"). It is a "person" under 42 U.S.C. § 1983. It is incorporated in the State of Ohio and has its principal place of business in Akron, Ohio.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the Fourteenth Amendment and/or Eighth Amendment to the Constitution of the United States. The Court also has original jurisdiction under 28 U.S.C. § 1343(a) because this case is a civil action to redress Defendants' actions

taken under color of law to deprive Mr. Butcher of civil rights guaranteed to him by the Constitution and federal law.

11. The Court has personal jurisdiction over all Defendants.

12. Venue is proper here because the events giving rise to the claims took place within this jurisdiction, and all parties reside, work, worked, or are located within this district.

### FACTUAL BACKGROUND

**Patrick Butcher: the tragedy, mental illness, and addiction that led to his incarceration at the Summit County Jail.**

13. Patrick Butcher was an intelligent, funny, and gentle-natured person who loved his work as a mechanic and valued spending time with his family, including his mother Terry DeVos, his siblings, and his wife Shelby.

14. In 2017, Patrick and Shelby were elated to learn that Shelby was pregnant with identical twin girls.

15. Despite receiving excellent prenatal care and undergoing frequent obstetric monitoring, Shelby went into premature labor in January 2018.

16. Tragically, both twins were stillborn. Their devastated parents named them Brynn and Briar.

17. After the stillbirth, Patrick was treated at the Summa Health System for extreme depression and anxiety. For about a month after the twins' death, he suffered an acute mental-health crisis. On January 29, 2018, he went to a hospital emergency room for a severe episode of depression and anxiety.

18.     Miraculously, Shelby soon became pregnant again. The pregnancy motivated Shelby and Patrick to work to process their grief over the twins so they could be good parents for the new baby. But Patrick continued to struggle emotionally.

19.     In November 2018, Patrick and Shelby welcomed a healthy, perfect baby girl: B.B.

20.     Although Patrick tried to enjoy life with Shelby and B.B., he remained traumatized by Brynn and Briar's death. At night, he regularly experienced auditory hallucinations that the twins were crying, preventing him from sleeping. Patrick often banged his head against the wall to block the sound of the twins' wailing.

21.     On May 24, 2019, Patrick was hospitalized for a suicide attempt. After that, he was diagnosed with post-traumatic stress disorder stemming from the twins' death.

22.     To numb his pain, Patrick began to self-medicate by abusing benzodiazepines and alcohol.

23.     Although Shelby loved Patrick, his mental-health and substance-abuse struggles were preventing him from being the husband she needed. She eventually filed for divorce from Patrick in March 2020.

24.     When Patrick was booked into the Summit County Jail on March 26, 2020 and then again on June 4, 2020, Shelby and Patrick's mother, Terry DeVos, believed the Jail would protect him from himself. They expected the Jail to help him detox and receive consistent treatment for his mental-health issues, including consistently administering his prescribed medications.

25.　At Patrick's intake assessment at the Jail on March 26, 2020, he disclosed his diagnoses of anxiety and depression, the trauma he suffered with the twins' death, his suicide attempt the prior year, and his family history of mental illness and suicide. He also requested a referral to mental-health providers to obtain care for his anxiety.

26.　At Patrick's intake assessment at the Jail on June 4, 2020, he again reported a history of mental illness and mental-health treatment. He specifically advised that the Cleveland Clinic had prescribed him Seroquel and Cymbalta and requested those medications.

27.　Seroquel (quetiapine) is an antipsychotic medication used to treat schizophrenia and bipolar disorder. Cymbalta (duloxetine) is an antidepressant, specifically a selective serotonin and norepinephrine reuptake inhibitor, used to treat major depressive disorder and general anxiety disorder.

28.　At all times, Jail medical staff had full access to Patrick's electronic medical records from both periods of Patrick's incarceration at the Jail.

29.　On June 4, 2020, after Patrick reported that he was prescribed Seroquel and Cymbalta, Jail staff requested Patrick's medical records to verify his prescriptions.

30.　Jail nurse Kim Croyle noted that she had received the Cleveland Clinic records, which confirmed his prescriptions for Seroquel and Cymbalta, on June 9, 2020.

31.　Patrick's Cleveland Clinic records also showed that he received treatment there for a panic attack on April 29, 2020 and an acute psychotic episode on May 6,

2020, which should have alerted Nurse Croyle to the urgency of providing Patrick his prescribed medications.

32.     Patrick sent kites reiterating his request for Seroquel and Cymbalta on June 4, June 5, June 8 (twice), June 12, June 13, June 14, June 15, June 16, June 17, and June 18, 2020.

33.     Although Summit County Jail medical staff received records verifying Patrick's prescriptions on June 9, 2020, Jail staff did not give Patrick his psychiatric medications until June 18, 2020, which was two weeks after he entered the Jail.

34.     Patrick wrote to his mother on June 18, 2020 about his extreme depression and suicidal thoughts:

> Something I haven't told you was that I made a noose probably my third day here and I secured it to the bunk above me. That's how easy it is to die here if you want to. That idea is becoming more of a 'when can I follow through without pulling it off' rather than 'will I do it.' It's like I've found justification to do it and I genuinely feel like everyone would be relieved once I do. It really sucks living like that every day. I'm more depressed than I've ever been and I can't keep trudging along and alone. I can't ask for help here either because their answer is to put you in a 'turtle suit' and take all your stuff away.

Patrick continued, lamenting the fact that he was denied his medication: "God forbid they give me the fuckin medication prescribed to me….This is such a bad place for me to be. I'm such a danger to myself here."

35.     During the course of his incarceration at the Jail, Patrick struggled with intense loneliness. As he told his mother, he had no friends or confidantes in the Jail. Many of his fellow inmates sought comradery through gang membership, but Patrick was never in a gang.

36.     Even after Patrick finally received psychiatric medications on June 18, he still did not receive the treatment he needed for his mental-health issues and was repeatedly told to wait for an uncertain duration.

37.     On June 22, 2020, Patrick sent a kite: "i would still like to remain on the list to see the doctor too, thank you."[1] Defendant Paulus-Bland responded the next day: "everyone on mental health meds is seen by the psychiatrist."

38.     On June 24, 2020, Patrick sent another kite: "i hope to be seen soon my depression seems to be at least the same if not worse, and anxiety very heavy as usual. was due for appointment to adjust meds/options for adding meds when arrested." Defendant Paulus-Bland replied the following day: "it should not be much longer."

39.     Patrick followed up with another kite on June 28, 2020: "how soon will I be seen by psychiatrist ide like to stay on top of my conditions as it feels like im falling farther from a therapeutic dose on my meds." Defendant Paulus-Bland responded on June 29: "we don't give dates so as not to disappoint anyone who may be expecting to be seen and doesn't happen due to emergencies or other situations but you are scheduled soon." Patrick thanked her for the update.

40.     On July 6, 2020, Patrick was finally seen by Dr. Susan Kimmel, a psychiatrist believed to an employee or contractor of Defendant Summit Psychological Associates. He reported ongoing hallucinations and anxiety to Dr. Kimmel and explained that

---

[1] All kites are transcribed verbatim.

although his mood "leveled out a little" after he took his medications, "now it feels like it is not enough."

41.     As of July 6, 2020, Patrick was taking 100mg of Seroquel and 30mg of Cymbalta. Dr. Kimmel increased his Seroquel dose to 200mg based on Patrick's symptoms.

42.     On July 7, 2020, Patrick sent a kite: "hi i noti3d my paper from visit yesterday says 30mg of Cymbalta. That 30mg was for the week I started taking it, then I moved to 60mg & been 60 ever since, you should have that prescription fromthem."

43.     Defendant Paulus-Bland responded to his kite on July 8: "medication has to be started at a lower dose if you haven't had recently then titrated up as determined by the psychiatrist." Patrick responded the same day: "yea that was a one week period on 30 then on to 60 ive been taking it several weeks probably a month.should be enough titration period for an ssnri? Please strt 60, explains my depression returning :(" Defendant Paulus-Bland responded that she would forward the kite to a nurse to address, and Patrick wrote back: "thank you sorry ive hd so many needs but I genuinely appreciate your help! Ide be going nuts literally othrwise."

44.     Patrick sent kites again requesting that he receive his originally prescribed dosage of Cymbalta (60mg) on July 11, July 13, July 16, and July 17, 2020. On July 13, he wrote: "im extremely depressed and not even on a therapeutic dose of my meds, please put me on 60."

45.     On July 17, 2020, after a nurse brought Patrick's requests to Dr. Kimmel's attention, Dr. Kimmel ordered Patrick's Cymbalta increased to 60mg. Patrick began receiving the 60mg dosage on July 18.

46.     On July 20, 2020, only two days after Patrick's Cymbalta dose had been doubled to address his severe depression, a licensed practical nurse named Nicole Rowe accused Patrick of spitting his evening 200mg dose of Seroquel into a cup in an effort to "cheek" or not take it. Patrick told Nurse Rowe that he had accidentally gagged on the pill and that he needed this medication. But Nurse Rowe refused to let him take the Seroquel on July 20.

47.     Nurse Rowe reported that Patrick was "cheeking" the Seroquel and asked for it to be discontinued. Despite knowing that Patrick needed this medication to control his psychiatric symptoms, Dr. Kimmel ordered his evening Seroquel dose (200mg) to be abruptly stopped without prescribing a replacement antipsychotic medication to treat his bipolar disorder. His last dose of Seroquel was July 19, just one day after he began an increased dose of Cymbalta for depression.

48.     Patrick's punishment for gagging on his pill was not limited to Jail medical staff denying him medication he needed: Jail corrections staff also placed Patrick in lockup, or solitary confinement, for two days based on Nurse Rowe's report that Patrick was "cheeking" medicine.

49.     On July 21, 2020, Patrick sent six kites begging for his Seroquel to be restored:

   a.  At 5:07 a.m.: "last night my medicine made me gag and flew out and nurse instantly said im done and made me give her my med instead of reswallow it. please dont withhold you know how bad I need my meds."

    b. At 5:09 a.m.: "can use clear bottle I have or whatever I need to do if shes worried I'm trying to pull anything on her. i won't be ok without my meds im already losing it."

    c. At 3:25 p.m.: "I will be contacting my lawyers and will be suing if my mood stabilizer is taken. i have a history of mental illness including several hospital visits where i was pink slipped and the removal of this"

    d. At 3:28 p.m.: "could lead to my death! im not playing this game with you guys again I need my damn medicine now. im already about to blow my top ill be suing and contacting local news contacts."

    e. At 3:50 p.m.: "if you guys were worriee about me taking it then crush it up like you do with suboxone inmates! ihy would you pick risking my life instead? iou guys don't care about people I'm gathering."

    f. At 3:50 p.m.: "i need my meds now."

50.    Patrick continued sending kites requesting his medication on July 22, 2020:

    a. At 9:48 a.m.: "i need my meds now today my brain is not in a good place this is crazy. im pleading for my meds trying to save myself this isn't a game to me sorry i gagged on my pill I'm not strong enoughtodothisanym"

    b. At 11:21 a.m.: "heollo 9i need help I need my mood stabilizer im not gonna get through the night without it im not messing around."

51.    On July 22, 2020, Patrick reported suicidal ideation and thoughts of self-harm to social worker Stephanie Stevenson, who was employed by Defendant Summit Psychological Associates. He told Ms. Stevenson he was in "a very dark place" and would not make it through the night. When Ms. Stevenson asked if he was suicidal, Patrick stated: "I could be anything at any time."

52.    Based on Patrick's statements and "poor insight," Ms. Stevenson had Patrick placed on suicide precautions from July 22 to July 23, 2020.

53.     Summit Psychological Associates did not send a medical professional or licensed mental-health professional to evaluate Patrick before he was taken off suicide precautions.

54.     Instead, Summit Psychological Associates sent an unlicensed psychology intern, Laura Fogarty, to speak with Patrick at the cell door rather than in a clinical or private setting. The intern, who was not supervised or accompanied by a licensed psychologist, recommended that he return to general population on July 23.

55.     After that, Patrick continued to send kites seeking the restoration of his Seroquel and care from a psychiatrist:

> a.  On August 1, 2020: "hi is my mental health appointment with psychiatrist coming up soon? My auditory hallucinations are pretty bad lately and of course my bpd is running its course im praying for my qutiepene! thanks." Defendant Paulus-Bland responded on August 3: "you are on list, cannot give exact time when you will be seen, you were caught cheeking the Seroquel so you cannot have that."

> b.  On August 3, 2020: "i wasn't cheeking i spit it out and the nurse made me give it to her even though i said i wanted to try to swallow it again. there was no cheeking involved!"

> c.  On August 5, 2020: "ok the nurse is leaving out the part that i wanted to try to swallow it again but i complied with her request to give her it instead of me getting it down. the point is i always want to take my meds." Defendant Paulus-Bland responded: "ok."

> d.  On August 24, 2020: "thAnk u will mh see me soon pleaSE." Defendant Paulus-Bland responded: "will add you to the list of inmates requesting to be seen by mh staff, on list for the doctor soon."

> e.  On August 25, 2020: "im just talk8ng about the monthly psychiatrist visit. my last appt was July 6th! nearly 2 months without a follow-up! whats going on."

> f.  On August 26, 2020: "it seems like 2 months for doctor visit is awfully long compared to the others on meds lately, i hope nothing is entered wrong or something is ALL."

56.     On August 27, 2020, Dr. Kimmel finally saw Patrick, one month and seven days after she had ordered immediate cessation of Patrick's evening Seroquel dose based on a nurse's disputed report that he was "cheeking" it.

57.     This was the first date Patrick was allowed to see a psychiatrist (or any physician) since July 17, 2020, despite his kites seeking assistance with psychiatric medications. Problems with medications must be addressed by a provider with prescribing authority—a physician. No medical reason justified this treatment delay, particularly because Patrick's medical records indicated that his next physician's appointment had been set for August 10.

58.     When Patrick saw Dr. Kimmel on August 27, 2020, he reported having auditory hallucinations and being "up and down" with symptoms of his bipolar disorder. He also told her he had felt worse since she discontinued his evening Seroquel dose.

59.     Instead of ordering that Patrick receive Seroquel, which had helped him before, Dr. Kimmel ordered that he begin a trial of Zyprexa 10 mg. Zyprexa, like Seroquel, is an oral medication. Zyprexa confers no advantage in preventing "cheeking."

60.     After Patrick began the Zyprexa Dr. Kimmel prescribed, he reported in kites that it was not sufficient to control his symptoms and asked to see a physician at least seven times between September 1 and October 10, 2020:

   a. On September 1: "Hi, is the doctor able to increase my dose of zyprexa before the next appointment or do I just have to wait till we're in person? I think I need the next dose up from 10mg (20 mAYBE?) THANKS." Defendant Paulus-Bland responded on September 3: "have to wait to see doctor who makes the determination, medications take time to feel full effect."

b. On September 18: "ismy appointment soon". On September 20, "Shannon M." responded: "You are scheduled for a follow up appointment with the psychiatrist. We are not able to provide specific information as to when you will be seen."

c. On September 26: "can the doc come soon please i might leave next week." Shannon M. replied on September 27: "You are on the list for follow up. We are not able to provide a specific date that you will be seen."

d. On October 9, at 7:32 a.m.: "hi im a worker now and I've been feeling dizzy and panicked in the mornings will the doctor see me soon." At 10:39 that day, Defendant Paulus-Bland responded: "will add you to the list of inmates requesting to be seen by mh staff, you are on the list to be seen by mh, will forward to bh nurse to address your concerns of side effects with the doctor."

e. On October 9, at 5:53 p.m.: Patrick responded, specifically advising that he needed a physician's care for his acute psychiatric issue: "ok i think its more of my pannick attacks needing more control than a side effect." Defendant Paulus-Bland did not respond until 7:37 a.m. on October 12, when she wrote to Patrick: "will add you to the list of inmates requesting to be seen by mh staff."

f. On October 10, at 3:45 a.m., Patrick sent another kite about his panic symptoms: "they sAid to kite because it's happening again." Again, Defendant Paulus-Bland did not respond until October 12, when she wrote at 7:37 a.m.: "Added to list to be seen."

g. On October 10, at 2:49 p.m.: "hi I'm not safe in my pod and I need help I asked dep but he said there's nowhere to put me? please help." Defendant Paulus-Bland never responded.

**Patrick was placed into the Jail's Trustee program and promptly removed because Ruthann Paulus-Bland said he was "playing games" when asked for afternoon or evening shifts because he felt anxious and panicked in the mornings.**

61. On September 30, 2020, Patrick entered into a plea agreement, and his sentencing for these non-violent offenses was set for October 21, 2020.

62.    Although Patrick hoped to be sentenced to a drug-rehabilitation program at Summit County's Community Based Correctional Facility, he feared that he would be sentenced to prison.

63.    Based on the plea agreement, Patrick became eligible for the Jail's Trustee program, in which inmates are allowed to work within the Jail. Trustees also receive more comfortable and spacious housing, more recreation opportunities, and unlimited access to the telephone.

64.    On or about October 5, 2020, Patrick qualified for the Jail's Trustee program.

65.    Patrick was thrilled to join the Trustee program because he enjoyed working and had always used working with his hands as a coping mechanism to counter his psychiatric symptoms.

66.    On October 9, 2020, Patrick was assigned to a morning shift in the Jail's kitchen. Patrick told a deputy in the Trustee program, Deputy Tracy Nyhart, that he felt ill and asked for an afternoon or evening kitchen shift.

67.    Deputy Nyhart advised Patrick that they did not usually allow Trustee workers to change shifts.

68.    Deputy Nyhart had a nurse see Patrick and noted in Patrick's inmate daily log that the nurse had "cleared him" and then gave Patrick the morning to rest.

69.    Deputy Nyhart next spoke to the "behavioral health supervisor," Defendant Paulus-Bland, who "advised this worker likes to play games and was caught cheeking his meds in July."

70.     Patrick had told Deputy Nyhart that he felt "anxious in the mornings" (consistent with his kites sent October 9 and 10) which Deputy Nyhart relayed to Defendant Paulus-Bland in the same conversation.

71.     In response, Defendant Paulus-Bland told Deputy Nyhart that Patrick "should not be having any issues with his meds" and that "if he can't work AM [morning] he can be removed as he is playing games and trying to manipulate."

72.     The deputy sent Patrick to work the afternoon of October 9, 2020 "due to the shortage he caused."

73.     On October 10, 2020, Patrick told Deputy Jerrime Weathers that he was not feeling well, and Deputy Weathers allowed him to switch shifts with another inmate. Deputy Weathers wrote in Patrick's inmate daily log that doing so had been a mistake and that he would make day shift aware "and the proper action can be taken with this inmate."

74.     Also on October 10, 2020, Deputy James Hipp wrote in Patrick's inmate daily log: "Inmate refused to go to his assigned shift in kitchen, he did this yesterday and was seen by medical and cleared, and mental health advised that there shouldn't be any reason he can't fulfill his work shift. He woke up this morning and advised the deputy he wasn't feeling well again and was replaced in the AM kitchen. Deputy Nyhart was advised that he woke another inmate and asked him to work his shift prior to advising the deputy."

75.     Patrick was removed from the Trustee program and returned to general-population housing on October 10, 2020.

76.     On October 11, 2020, when Patrick spoke to his mother at approximately 11:04 a.m., he explained why he had requested different Trustee shifts: "When I was getting up that early, with my medicine…I think I was having panic attacks or something, I don't know. But it was weird.…I felt like I needed to, like, run, like that fight or flight feeling, made me feel like I needed to get the f*** out of there. And I tried to switch to PM but they wouldn't let me."

### Patrick tells Summit County deputies he's suicidal; deputies take no action.

77.     On October 11, 2020, the day after Patrick sent his final unanswered kite pleading for help because he was not safe in his pod, Patrick told Deputy DeMarco, Deputy Fedrick-Finn, and several other deputies whose names are unknown that he was suicidal and did not want to return to his cell. He also told them that he was afraid his cellmate would beat him up when they returned to the cell.

78.     Patrick explained to these deputies that he had "snitched" on his cellmate's fellow gang member, prompting his cellmate to threaten him with violence.

79.     At least five other inmates heard Patrick tell the deputies he wanted to kill himself and that he feared being attacked by his cellmate.

80.     Deputy DeMarco wrote in Patrick's inmate daily log for October 11, 2020: "Inmate Butcher stated multiple times that he was in fear for his life and that there are people on the pod 4A, that are wanting to beat him up because of him telling on someone else. Inmate Butcher has other PIs stating he was in fear for his life."

81.     Although at least five other inmates heard Patrick tell Deputy DeMarco that he wanted to kill himself, Deputy DeMarco only recorded in the inmate daily log that

Patrick was "in fear for his life," implying that he feared that another inmate would kill him—not that he would kill himself, as Patrick had said.

82.     Although at least five other inmates heard Patrick tell Deputy DeMarco that he feared attack specifically from his cellmate, Deputy DeMarco only recorded in the inmate daily log that "people on the pod" wanted to "beat him up because of him telling on someone else." Deputy DeMarco failed to record in the log that Patrick's *cellmate* wanted to beat him upon lockup.

83.     None of the Summit County deputies to whom Patrick said he was suicidal took action to place Patrick on suicide watch or remove the means for lethal injury from his cell. These deputies, including Defendants DeMarco and Fedrick-Finn, instead forced Patrick to return to his cell with the cellmate he feared.

84.     It was foreseeable to these deputies that Patrick's cellmate would beat up Patrick for snitching on the cellmate's fellow gang member because the Jail's deputies were familiar with the gangs' typical patterns of behavior. But none of these deputies took action to protect Patrick from his cellmate.

85.     Shortly after the Summit County deputies forced Patrick to return to his cell, Patrick's cellmate attacked him. Patrick did not fight back. Instead, he pressed the "panic button" to summon a deputy to his cell.

86.     Deputy DeMarco, who knew Patrick was suicidal and afraid of his cellmate, responded and investigated the incident.

87.     Both Patrick and his cellmate told Deputy DeMarco that Patrick did not fight back when the cellmate struck him. But Deputy DeMarco concluded that they

mutually engaged in fighting, causing Patrick to be punished for being attacked and not fighting back.

88.     Deputy DeMarco's Discipline Report for the incident noted that he based his finding that Patrick was "guilty of fighting" based on his investigation "and video footage." But no video footage of the attack existed. The attack occurred within the cell, and surveillance cameras did not capture the inside of the cell.

89.     As a result of Deputy DeMarco's investigation and conclusions, Patrick's cellmate was removed from their cell and placed in disciplinary isolation for five days.

90.     As a result of Deputy DeMarco's investigation and conclusions, Patrick was required to attend a disciplinary hearing with Sergeant Milorad Cucuz at 8:00 a.m. on October 12.

91.     Defendant Summit County's records department has advised that no recording or transcript of Patrick's October 12 disciplinary hearing exists in response to public-records requests.

92.     At the October 12 hearing, Sergeant Cucuz—apparently believing the conclusions of Deputy DeMarco and disbelieving Patrick's insistence that he did not engage in fighting—sentenced Patrick to five days of solitary lockdown in his cell.

### In response to Patrick's many kites seeking medication adjustments, Summit Psychological Associates dispatched a psychology intern unqualified to address Patrick's medications.

93.     According to records produced by Summit Psychological Associates, a psychology intern, Jamie Giglio, visited Patrick at his cell and spoke to him from his cell door for approximately 20 minutes at 12:00 p.m. on October 12, 2020.

94.     Summit Psychological Associates' written records state that the intern visited Patrick in response to his kites seeking mental healthcare, most of which requested modification of his psychiatric medications.

95.     Neither Defendant DeMarco, Defendant Fedrick-Finn, nor any other Summit County Deputy asked Summit Psychological Associates (or anyone else) to provide mental-health services or psychiatric care to Patrick.

96.     Neither Defendant DeMarco, Defendant Fedrick-Finn, nor any other Summit County deputy told Ms. Giglio that Patrick said he was suicidal the prior day.

97.     Ms. Giglio was not and is not a physician, psychiatrist, or other provider authorized to prescribe medications.

98.     Ms. Giglio was not licensed by the Ohio Board of Psychology. On information and belief, she is still not licensed.

99.     Ms. Giglio had never provided services to Patrick before she allegedly saw him on October 12.

100.    According to the records created by Summit Psychological Associates, Ms. Giglio was not accompanied by a licensed psychologist serving as her supervisor when she saw Patrick on October 12, 2020. Instead, the records state that the intern was accompanied only by a deputy.

101.    No licensed psychologist who served as the intern's supervisor ever assured that Patrick was "clearly informed of the relationship between the supervisor and the supervisee, and their respective legal and professional responsibilities for the services

rendered to or received by the client" as required by Ohio Adm. Code § 4732-13-04(12).

102.    Nor did any licensed psychologist inform Patrick about "the supervised nature of the work of the supervisee, and of the ultimate professional responsibility of the supervisor…in the form of a written statement" with respect to the psychology intern, as also required by Ohio Adm. Code § 4732-13-04(12).

103.    The written records state that Ms. Giglio deemed Patrick's depression to be "mild" and his anxiety to be "moderate."

104.    According to Summit Psychological Associates' written records, Patrick "inquired about seeing the doctor to increase his medication" consistent with his kites. The records state that Ms. Giglio informed Patrick that he was "on the list to be seen" but that she was "unsure of when."

105.    According to the records, Ms. Giglio took no action to address the problem of Patrick remaining on a waiting list of unspecified duration to see a psychiatrist.

106.    Summit Psychological Associates' written records state that Patrick told Ms. Giglio he was experiencing "increased mood swings and anxiety," "heart racing," "racing thoughts," nausea, and feeling "tingly." According to the records, the intern took no action to address Patrick's symptoms.

107.    According to the records, Ms. Giglio suggested "coping skills," but Patrick was "not amenable" because "those don't work." According to the records, Ms. Giglio took no action to address Patrick's stated hopelessness and refusal to attempt coping skills.

108. Summit Psychological Associates' written records state that Patrick denied suicidal or homicidal ideation "when asked these questions by intern by shaking his head 'no.'" According to the records, Ms. Giglio used no other questions or techniques to provide an objective assessment of Patrick's suicide risk. The intern only considered Patrick's subjective denial of suicidal ideation, given in a non-private setting, without considering his risk factors.

109. At the time a Summit Psychological Associates psychology intern allegedly spoke with Patrick at his cell, Patrick had the following risk factors for suicide:

    a. Previous suicide attempt(s) and self-harm;

    b. Mental illness;

    c. Social isolation;

    d. Criminal problems (including impending sentencing on October 21, 2020 and fears that his sentencing would be adversely affected by his discipline for "fighting");

    e. Financial problems;

    f. Job loss (loss of Trustee position);

    g. Legal problems;

    h. Substance use disorder;

    i. Bullying (including violence at the hands of his cellmate);

    j. Family history of suicide;

    k. Recent divorce (finalized October 7, 2020);

    l. Recent loss of family member (his grandmother, who had died five days earlier).

110. According to the records provided by Summit Psychological Associates, the intern electronically approved her report at 1:16 p.m. on October 12.

111.    According to these records, Summit Psychological Associates supervisor Ruthann Paulus-Bland, a licensed independent social worker—**not** a licensed psychologist—approved the intern's report at 3:03 p.m.

112.    When approving the electronic report, Ms. Paulus-Bland would have had the ability to modify what the intern had reported.

113.    An inmate whose cell was adjacent to Patrick's cell did not see or hear the Summit Psychological Associates intern visiting Patrick's cell on October 12.

114.    The surveillance video produced by Summit County in response to a public-records request, which would have showed the intern standing at the door of Patrick's cell if she had visited as the records state, does not show the intern visiting Patrick's cell because Summit County only retained surveillance video beginning at approximately 1:30 p.m. for October 12, 2020.

### Patrick dies in his cell.

115.    Several hours after the hearing, at 12:55 p.m., Patrick's pod was placed on lockup.

116.    No video depicts Patrick's final moments within the confines of his cell as he wrote his final letter.

117.    At approximately 2:04 p.m., the cell doors in Patrick's pod were unlocked.

118.    Two inmates in a cell next to Patrick's came out, and one knocked on his door. Seeing toilet paper covering the window on Patrick's cell door, the inmate called to Patrick: "You ain't hanging, is you?" The inmate jumped up to look around the tissue on the window to see into Patrick's cell. He cried out, "Oh, he is!" The second inmate

jumped up to look through the window, called out, and sprinted down the steps to bang on the door for the deputies, asking them to come help.

119.    Other inmates gathered around Patrick's cell, and deputies came out and ordered lockup.

120.    The last time any Summit County deputy had done rounds before the inmates discovered Patrick's death was at 1:45 p.m. On the surveillance video, Deputy Robert McCutcheon appeared to look in the direction of Patrick's door. The camera angle of surveillance video showing Deputy McCutcheon's 1:45 p.m. round does not allow a viewer to see whether toilet paper covered Patrick's window.

121.    When paramedics and medical professionals arrived to take Patrick's body to the hospital in an effort to revive him, one or more Sheriff's deputies advised that the last rounds had been 20 minutes before. One medical professional reacted with skepticism and remarked Patrick had been dead in his cell for at least an hour.

### Summit County's investigation of Patrick's death was limited to confirming that it was suicide and ignored multiple witness statements that Patrick told Deputy DeMarco he was suicidal.

122.    Summit County Detective Jason Kline investigated Patrick's death.

123.    When Detective Kline interviewed Deputy McCutcheon, who did rounds 20 minutes before other inmates discovered Patrick hanging, Deputy McCutcheon said he was "'fairly' confident Inmate Butcher was not hanging" during the last round.

124.    Detective Kline interviewed several inmates. Four inmates told Detective Kline that Patrick told deputies he was suicidal on October 11, 2020, with three specifically naming Deputy DeMarco as one deputy to whom Patrick disclosed suicidal ideation.

125.    Detective Kline's report contains no indication that he interviewed Deputy DeMarco or any other deputy to whom Patrick said he was suicidal, including Deputy Fedrick-Finn.

126.    Detective Kline's report states: "On 10-11-2020, Deputy DeMarco did document Inmate Butcher wanting to be reassigned due to receiving threats of harm in retaliation for his providing information on other inmates. There is no mention of making suicidal threats." Detective Kline relied on this report without speaking to Deputy DeMarco about the meaning of Patrick's statements that he was in fear for his life.

127.    Detective Kline's report states: "The Inmate Daily Log for Inmate Butcher notes several past incidents of Inmate Butcher attempting to manipulate the deputies to get out of trusty work assignments and housing. He had made multiple claims of being in fear for his life to deputies at the jail dating back to July 2020." Detective Klein's report thus implied that Patrick's statements of suicidal ideation were efforts to manipulate, even though he knew then that Patrick had *actually died by suicide*.

128.    As part of his investigation, Detective Kline reviewed the goodbye note Patrick left in his cell, which included the following: "Deputy DeMarco and Finn didn't do anything when I plead with them to help me and that I was going to get hurt. The Seargent was also wrong for saying I was fighting—I was not, I was attacked by my cellmate just as I said would happen…DeMarco knew everything that happened and did nothing—presumably because he didn't want to be in trouble for leaving the cells unlocked during the day."

129.   Patrick's final note also stated: "I also have plead with mental health to see me because my Bipolar is so bad but they haven't helped me out."

130.   Just as Detective Kline's report contained no indication that he interviewed Defendant DeMarco, DeMarco's personnel file from Summit County contains no indication that he was otherwise interviewed, investigated, or disciplined for doing nothing after Patrick told him he was suicidal and then died by suicide.

131.   Likewise, Detective Kline's report contained no indication that he interviewed Deputy Fedrick-Finn, and Fedrick-Finn's personnel file from Summit County contains no indication that he was otherwise interviewed, investigated, or disciplined for doing nothing after Patrick told him he was suicidal and then died by suicide.

132.   Detective Kline's report contained no indication that he interviewed any "mental health" staff or reviewed Patrick's kites seeking mental-health assistance.

133.   The actions of Detective Kline, Defendant DeMarco, and Defendant Fedrick-Finn exemplify and were caused by Summit County's culture of deliberate indifference to the mental illness of incarcerated people.

### In 2018, the Summit County Jail Operations Advisory Commission recommended that the Jail provide more mental-health services to inmates. It didn't.

134.   On October 2, 2017, Summit County Council District 5 Representative David Hamilton introduced legislation to convene the Summit County Jail Advisory Commission ("the Commission"), which the Summit County Council later passed unanimously.

135.   The Commission was charged with developing an understanding of the Jail's operations and providing recommendations for best practices and improving operations for both staff and inmates.

136.   On August 14, 2018, the Commission issued its Report and Recommendations, which were explicitly focused on the mental health of incarcerated people. In particular, the report was directed to improving their ability to access services and inmate-suicide prevention.

137.   One of the Commission's official Recommendations was "Increase focus on mental health services and work with the Summit County Criminal Justice and Mental Health Forum to develop a plan for high utilizers." The specific sub-recommendations to accomplish this included the following:

    a.  "Support and work on universal release of information—gives people permission to share private health information exception to HIPAA Laws."

    b.  "Provide additional mental health beds at the Jail." The Commission explained in support of this sub-recommendation that there were then 27 total cells for people with mental illnesses (24 cells for men and three for women). Because there were usually 150 people in the behavioral-health system at the Jail at any given time, "[t]here must be more beds made available." There had historically been 48 mental-health cells available. Increasing that number, the Commission explained, would allow the staff to "take better suicide precautions and decrease the risk of suicides in jail by inmates."

    c.  "Increase staffing on Mental Health Unit."

    d.  "Technology Improvements for Mental Health records software." The Commission explained that the software was not easy to use and that updating it would improve mental-health workers' response time and allow them to spend more time with patients.

    e.  "Improve mental health service access to inmates." Specifically, the Commission recommended "[i]ncreas[ing] mental health staff access by

providing additional deputies necessary for supervision" because "[i]f the Jail was staffed with more deputies, workers could provide more meetings…increasing availability from 3-2 hour blocks to 5-2 hour blocks." The Commission also recommended "[c]reating separate rooms for individual meetings with inmates and staff/counselors" because "[l]arge open spaces where counselors talk to inmates are less private and not conducive to counselor and inmate meetings." Further, "if there were more rooms dedicated to inmate/counselors, the counselors could see more inmates during the day."

138.   On August 30, 2018, Summit County Executive Ilene Shapiro issued a news release summarizing the annual State of the County Address given that same day and announcing plans to implement some, but not all, of the Summit County Jail Advisory Commission's Recommendations.

139.   The August 30, 2018 news release stated Executive Shapiro "described two primary recommendations: increased staffing and restored inmate services." She then "announced joint legislation…to install a new camera system in the Summit County Jail for the protection of both inmates and jail staff[;]" legislation to re-designate another local jail as a Community Alternative Sentencing Center to allow 16 Sheriff's deputies to be relocated to the Summit County Jail; a plan for deputies at the Jail to work 12-hour shifts to allow more "deputy coverage" and "reduce overtime costs;" and a plan for the Sheriff's Office to "hire additional full-time inmate service workers to re-open the gymnasium and library and to restore AA [Alcoholics Anonymous] and NA [Narcotics Anonymous] services, as well as religious services."

140.   The news release and Executive Shapiro's State of the County Address omitted any promise to accomplish the Commission's primary stated objectives: to improve inmates' access to mental-health services and to strengthen suicide-prevention measures.

141.   The following year, on August 29, 2019, Summit County Executive Shapiro issued another news release summarizing her 2019 State of the County Address and providing an update on implementing the Summit County Jail Advisory Commission's Recommendations.

142.   The August 29, 2019 news release announced that the County had taken the following actions in the Summit County Jail: replacing 107 cameras, installing 261 new cameras, reintroducing Alcoholics Anonymous and Narcotics Anonymous, reintroducing religious services, reintroducing gymnasium time, reopening the Jail library, and successfully transferring 18 inmates after re-designating another local jail as a Community Alternative Sentencing Center.

143.   Executive Shapiro did **not** address any of these specific Recommendations by the Commission to improve Jail mental-health services:

  a.  "Support and work on universal release of information—gives people permission to share private health information exception to HIPAA Laws;"

  b.  "Provide additional mental health beds at the Jail" to "take better suicide precautions and decrease the risk of suicides in jail by inmates."

  c.  "Increase staffing on Mental Health Unit;"

  d.  "Technology Improvements for Mental Health records software;"

  e.  "Improve mental health service access to inmates" to allow more opportunities for counseling, including by "[c]reating separate rooms for individual meetings with inmates and staff/counselors" because "[l]arge open spaces where counselors talk to inmates are less private and not conducive to counselor and inmate meetings."

144.    The County did not enact legislation or take action implement these specific recommendations the Commission made to improve the Jail's mental-health services in 2018, 2019, or 2020.

145.    Summit County, through its County Executive and County Council, made conscious choices not to implement recommended reforms to provide incarcerated people increased clinical mental-health services. Although permitting incarcerated people greater access to a gymnasium and library helps improve their quality of life, neither these nor the religious services offered (including Narcotics Anonymous and Alcoholics Anonymous) addressed clinical mental illness as the Commission advised was necessary.

146.    If Summit County had implemented policies allowing universal releases of information as the Commission recommended, the Sheriff's deputies would have had a better understanding of Patrick's suicide risk.

147.    If the Jail had added mental-health beds as the Commission recommended and increased staffing on the Mental Health Unit, on information and belief, Patrick would have qualified for Mental Health Housing because of his severe and persistent mental illness.

148.    If the Jail had created additional private spaces for incarcerated people to speak with mental-health staff as the Commission recommended, mental-health professionals would have had a better opportunity to discern Patrick's suicide risks.

149.    If Patrick had received greater access to improved mental-health services, as recommended by the Commission, including medication services and therapy, he likely would not have died by suicide on October 12, 2020.

### Summit County failed to train Sheriff's deputies working in the Jail about preventing suicides.

150.    Defendant Summit County failed to provide any suicide-prevention training to its deputies who interacted with Patrick on October 11 and October 12, 2020.

151.    On information and belief, Defendant Summit County's failure to train these deputies extends to all deputies.

152.    Defendant Summit County received warning of the need to complete suicide-prevention well before Patrick's death. On February 14, 2017, Ohio Department of Rehabilitation & Correction State Jail Inspector Joel Commins sent a letter to then-Sheriff Steve Barry regarding the 2016 annual inspection of the Summit County Jail. In this letter, Inspector Commins advised that the Jail policy supporting standard Ohio Adm. Code § 5120:1-8-09(N)(2) needed revisions to reflect the language and requirements of the legal standard.

153.    Ohio Adm. Code § 5120:1-8-09(N)(2) requires the following as an "essential" standard for Ohio correctional facilities: "Training – Staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide and how to respond appropriately. The plan includes initial and annual training."

154. Although then-Sheriff Steve Barry updated the language of the *policy* to comply with Ohio Adm. Code § 5120:1-8-09(N)(2), Sheriff Barry failed to have Jail staff actually complete the required training.

155. The Summit County Sheriff's policy for training Jail staff on suicide prevention that was in effect on the date of Patrick's death, Policy No. 11.7.1 (effective September 9, 2019), Suicide Prevention and Response, provided as follows:

> Security staff shall be familiar with and remain aware of factors that may indicate an increased chance for inmate suicide. When the potential for inmate suicide is suspected, security staff will attempt appropriate intervention measures to prevent such action. Measures shall include placement of the inmate in a protective setting, removal of objects that can be used to inflict self-harm, restrictions of selected privileges, and close monitoring of behaviors until determined by qualified mental health personnel that the inmate is no longer a threat to himself.

156. Policy No. 11.7.1 also specified training requirements for staff:

> X.    Training
>
>> A.    Training will be provided to staff that are responsible for the care and supervision of inmates so that they are able to recognize verbal and behavioral cues that indicate potential suicide.
>
>> B.    Training will consist of initial training as provided by the Ohio Corrections Training Academy and annual training thereafter.
>
>> C.    Deputies assigned to the mental health housing areas may be provided supplemental training by the Mental Health Coordinator or designee.

157. Policy No. 11.7.1(X)(B) states that initial suicide-prevention training will be given to Jail staff by the Ohio Corrections Training Academy. But the Ohio Corrections Training Academy's Superintendent advised that the Academy has *never*

provided training to any employee of the Summit County Sheriff's Department on preventing suicide or mental health.

158.    None of the Sheriff's deputies on duty on the date of Patrick's death, including Defendants DeMarco and Fedrick-Finn (and eight other officers), had received *any* training on suicide prevention—from the Ohio Corrections Training Academy or otherwise—as required by Ohio Adm. Code § 5120:1-8-09(N)(2) and Policy No. 11.7.1.

159.    The Summit County Sheriff's Office Training Bureau did not provide training that addressed suicide prevention as required by Ohio Adm. Code § 5120:1-8-09(N)(2) and Policy No. 11.7.1 between 2015 and 2020.

160.    According to the Ohio Peace Officer Training Academy online transcripts for each of the Summit County Sheriff's deputies on duty the day of Patrick's death, none received training on preventing suicide.

161.    The Ohio Department of Rehabilitation & Correction flagged this training deficiency again in 2020 before Patrick's death. On February 4, 2020, ODRC Inspector Joel Commins wrote a letter to Summit County Sheriff Barry regarding the results of the 2019 Annual Jail inspection, which occurred October 22, 2019. Inspector Commins advised that the Jail was not in compliance with the following standards:

> Ohio Adm. Code § 5120:1-8-18(B) (Important) Correctional officers shall receive training as follows: (1) Training in jail policies and [sic] within sixty days of employment. (2) During the first year of assignment, training consistent with Chapter 109:2-9 of the Administrative Code.

Inspector Commins wrote that the Jail "did not provide supporting documentation in order to evidence compliance" with these standards.

> Ohio Adm. Code § 5120:1-8-18(C) (Important) Administrators and supervisors shall receive training in addition to the training specified in paragraph (B) of this rule as follows: (1) Training in jail policies and procedures prior to assignment to jail duties. (2) During the first year of assignment, forty hours of training including legal aspects of jail management, managerial principles, labor relations, and records/information management.

Inspector Commins wrote that the Jail "did not provide supporting documentation in order to evidence compliance" with these standards.

162.   Summit County could not provide documents to the ODRC Inspector to show compliance with these standards because the County did not provide the required training on Jail policies.

163.   During the period of Patrick's incarceration in the Jail in 2020 and on October 12, 2020, Summit County had not met the suicide-prevention training requirements of Ohio Adm. Code § 5120:1-8-09(N)(2) for the Sheriff's deputies working in the Jail. Despite receiving actual notice of the need to meet this requirement from the ODRC multiple times before October 12, 2020, Defendant Summit County, through its Sheriff, failed to implement necessary suicide-prevention training.

**Prior deaths by suicide and suicide attempts by people incarcerated at the Jail alerted Summit County to the need for more suicide-prevention training and inmate monitoring.**

164.   Defendant Summit County also had actual notice of the need for suicide-prevention training from reports of deaths by suicide, suicide attempts, and "suicidal gestures" that occurred between January 1, 2016 and October 12, 2020.

165.   Defendants Summit County and Summit Psychological Associates had actual knowledge of at least three suicides that occurred in the Jail between January 1, 2016 and October 12, 2020, when Patrick died.

166.    The Summit County Sheriff and Summit Psychological Associates had actual knowledge of at least **75** incidents in which incarcerated people attempted to die by suicide in the Jail between January 1, 2016 and October 12, 2020.

167.    The Summit County Sheriff and Summit Psychological Associates had actual knowledge of many other suicide threats and "suicidal gestures," as well as incidents of self-harming behaviors by people incarcerated at the Jail between January 1, 2016 and October 12, 2020.

168.    According to the 2020 Summit County Sheriff's Annual Report, there were 17 suicide attempts and two deaths by suicide in the Summit County Jail in 2020. Based on the Summit Psychological Associates' 2020 Major Unusual Incident Reports submitted to the County of Summit ADM Board as a condition of funding ("Major Unusual Incident Reports"), four of these suicide attempts occurred after Patrick's death, leaving **13** attempts that occurred before October 12. The person who died by suicide in the Jail in 2020 before Patrick's death also hanged himself with a sheet. Of the attempts Summit Psychological Associates reported to the ADM Board, at least one of the attempts to die by suicide made in 2020 before Patrick's death was by hanging with a sheet.

169.    The 2020 Major Unusual Incident Reports also described a number of incidents not classified as suicide attempts in which incarcerated people engaged in self-harming behaviors or voiced suicidal ideation.

170.    According to the 2019 Summit County Sheriff's Annual Report, there were **nine** reportable suicide attempts and one completed suicide in the Summit County

Jail in 2019. Of the attempts Summit Psychological Associates reported to the ADM Board for that year, at least four of these attempts were by hanging with a sheet.

171.   The 2019 Major Unusual Incident Reports also described a number of incidents not classified as suicide attempts in which incarcerated people engaged in self-harming behaviors or voiced suicidal ideation.

172.   According to the 2018 Summit County Sheriff's Annual Report, there were **36** reportable suicide attempts and one death by suicide in the Summit County Jail in 2018. The person who died by suicide in the Jail that year hanged himself with a sheet. Of the attempts Summit Psychological Associates reported to the ADM Board for 2018, at least four of these attempts were by hanging with a sheet.

173.   The 2018 Major Unusual Incident Reports also described a number of incidents not classified as suicide attempts in which incarcerated people engaged in self-harming behaviors or voiced suicidal ideation.

174.   According to the 2017 Summit County Sheriff's Annual Report, there were **nine** reportable suicide attempts in the Summit County Jail in 2017. Of the attempts Summit Psychological Associates reported to the ADM Board for that year, at least two of these attempts were by hanging with a sheet.

175.   The 2017 Major Unusual Incident Reports also described a number of incidents not classified as suicide attempts in which incarcerated people engaged in self-harming behaviors or voiced suicidal ideation.

176.   According to the 2016 Major Unusual Incident Reports, there were **eight** suicide attempts and 1 death by suicide in the Summit County Jail in 2016. The

person who died by suicide in the Jail that year hanged himself with a sheet. Of the six attempts Summit Psychological Associates reported to the ADM Board for that year, at least two of these attempts were by hanging with a sheet.

177.    The 2016 Major Unusual Incident Reports also described a number of incidents not classified as suicide attempts in which incarcerated people engaged in self-harming behaviors or voiced suicidal ideation.

### Wayne Jordan

178.    On February 12, 2016, inmate Wayne Jordan died by suicide after hanging himself Win his cell at Summit County Jail.

179.    The Summit County Jail initial health screening documented that Mr. Jordan had a history of brain aneurysm resulting in seizures and inpatient hospital admission for psychiatric evaluation after making a statement of suicidal ideation approximately one year before he was booked into the Jail.

180.    At the time of his death, Mr. Jordan was a pretrial detainee scheduled to begin trial for two serious felonies the next month, March 2016.

181.    Although Mr. Jordan had objective risk factors for suicide during his approximate four months of incarceration at the Summit County Jail (including but not limited to his gender, age, stress level, a family history of suicide, and the nature of the crime he was accused of committing), Jail staff did not ensure that he received a full psychological or psychiatric evaluation.

182.    Other people incarcerated in the Jail told the investigating detective that Mr. Jordan had recently seemed depressed and fearful of going to prison."

183.   On February 12, 2016, Mr. Jordan was found hanging by a bed sheet in his cell when a deputy conducted rounds.

184.   Mr. Jordan left behind a farewell note to his wife, telling her she had been a great wife and saying "he just got sick."

### Wanda Filing

185.   On February 4, 2018, inmate Wanda Filing died by suicide after hanging herself with a bedsheet in her cell at Summit County Jail.

186.   Ms. Filing's time incarcerated at the Jail was difficult. Other inmates bullied her, even though "Red" (as Ms. Filing's friends called her) was nice to everyone.

187.   Ms. Filing had several psychiatric diagnoses, including depression, anxiety, and post-traumatic-stress disorder. Ms. Filing was prescribed Prozac (fluoxetine) and Buspar (buspirone) for these conditions. Ms. Filing also struggled with ongoing drug addiction, for which she required "detox" when she entered the Jail on January 24, 2018.

188.   Ms. Filing's mental illnesses and addiction were exacerbated by her son's death in approximately 2017. She often spoke about her grief over the loss of her son to other women on her pod.

189.   Ms. Filing, who had been booked into the Jail for a probation violation and drug possession, was in the process of attempting to gain admission to the Summit County Community Based Correctional Facility ("CBCF") for a drug-rehabilitation program. Ms. Filing feared being sentenced to prison time or the Glenwood Jail.

Another inmate who was going to CBCF was helping Ms. Filing to write a letter to the judge for consideration in sentencing.

190. Ms. Filing's in-progress draft letter to Judge Rowlands was found in her cell after her death. It read:

> Your honorable Judge Rowlands,
> 1st your honor, I'd like to apologize to the courts for being a part of the problem, instead of being part of the solution for far, far too long.
> A little over a year ago, I lost my 1stborn son to heroin. Words can never express the loss, that my family and I have had to endure. I went into a spiral…depression. I did not want to live in this life anymore. The only reason I did not end my life too was because I could not do that to my family.

191. The Medical Examiner's Report of Investigation states that Ms. Filing "was involved in a physical altercation with another female inmate" on February 4, 2018 and that according to Detective Kline, the other inmate punched Ms. Filing once in the mouth.

192. According to witness statements given to Summit County detectives, Ms. Filing was not merely "involved in a physical altercation" in which she was punched once in the mouth. Instead, another incarcerated person physically attacked Ms. Filing while Ms. Filing was sitting on her bed and repeatedly struck Ms. Filing on her head and torso. Ms. Filing curled up into a ball on her bed, trying to evade the blows.

193. As she tried to shield herself without fighting back, Ms. Filing said to her attacker: "You're not going to mess up my chances of going home." But the other incarcerated person escalated the assault by grabbing Ms. Filing's legs to pull her off the bed.

194.    As Ms. Filing was pulled off the bed and onto the floor, her head struck the bed or floor with a "significant whack." Once on the ground, Ms. Filing was forced to defend herself. As an eyewitness to the entire attack said, "Red didn't do anything wrong."

195.    Even though Ms. Filing insisted that she had been attacked, Summit County Jail deputies wrote her up for fighting and sent Ms. Filing to a cell for solitary confinement.

196.    Deputies observed Ms. Filing crying for more than an hour after the attack. She voiced distress over being written up and asked how long she would be required to be in solitary confinement. One or more deputies told her it was the sergeant's decision.

197.    On information and belief, Ms. Filing told one or more deputies that she could not be alone in a cell because of her mental state, but Summit County deputies forced her into solitary confinement anyway.

198.    Later that day, a Summit County deputy performing rounds found Ms. Filing hanging by a bed sheet in her cell.

199.    Ms. Filing left a farewell note in her cell. It read: "Tell my kids, I love them. I'm sorry. We will be together again. I miss Bobby too much…You bitches that run this jail, you will stand before God for the way you treat people."

### Tad Simms

200.    On February 17, 2020, less than eight months before Patrick died, inmate Tadd Simms died by suicide after hanging himself by a bedsheet in his cell at Summit County Jail.

201.   Mr. Simms was booked into the Jail on February 14, 2020. According to the Medical Examiner's Report of Investigation, he was originally assigned to one unit but began ramming his head into the door. He was restrained, and after mental or behavioral-health staff spoke with him, he was reassigned to a different unit. He was assigned to a bottom bunk for detoxing.

202.   Mr. Simms informed Jail staff that he had been diagnosed with psychiatric conditions and that he had made multiple prior attempts to die by suicide. Mr. Simms had previously attempted to die by wrecking his truck, cutting his arm, slitting his wrist, and trying to jump off a building.

203.   Mr. Simms informed Jail staff that he had struggled with addiction from an early age, including pills, Ritalin, methamphetamines, and heroin. He advised that he had "been prescribed everything" for his conditions but that nothing had worked.

204.   Mr. Simms was last seen alive at approximately 2:00 p.m. on February 17, 2020, when his cellmate left their cell to watch television. At around 4:00 p.m. that day, a Summit County deputy began key rounds and walked by the cell, where he saw what he would later say he believed to be Mr. Simms kneeling on the floor in prayer. After taking a few steps past Mr. Simms's cell, perhaps remembering the bedsheet noose visible around Mr. Simms's neck, the deputy returned and saw that Mr. Simms was hanging by a bedsheet in by a bed sheet in a kneeling position.

205.   These prior inmate deaths by suicide and attempts to die by suicide in the Jail should have prompted Summit County to require suicide-prevention training for its Sheriff's deputies in the Jail.

206. These prior inmate deaths by suicide and attempts to die by suicide in the Jail should have caused Summit Psychological Associates to provide more and better suicide-prevention training to its employees in the Jail and to ensure appropriate levels of staffing for psychiatrists and mental-healthcare providers.

207. The similarities between the prior deaths by suicide and Patrick's death made the failures of Defendant Summit County and Defendant Summit Psychological Associates to take appropriate remedial measures after the previous deaths all the more egregious.

208. Like Mr. Jordan, Ms. Filing, and Mr. Simms, Patrick died by hanging himself from a bedsheet in his cell.

209. Like Mr. Jordan, Patrick had objective risk factors for suicide, including prior psychiatric hospitalization and a family history of suicide.

210. Like Ms. Filing, Patrick was bullied and violently attacked by another inmate but punished by writeup and solitary confinement. Summit County's practice of blaming and punishing inmates who had been attacked caused significant stress for Ms. Filing and Patrick, both of whom were seeking sentences at CBCF rather than prison.

211. Like Ms. Filing, Patrick was diagnosed with psychiatric conditions and prescribed psychiatric medications.

212. Like Ms. Filing, Patrick told Summit County deputies that he could not be alone in the cell and disclosed suicidal ideation. The deputies forced both Ms. Filing

and Patrick into solitary confinement after they indicated suicidal intentions and did not monitor them to ensure they did not engage in the self-harm.

213.   Like Mr. Simms, Patrick had a history of addiction struggles and prior attempts to die by suicide.

214.   Both Defendant Summit County and Defendant Summit Psychological Associates failed to act to protect and care for Mr. Jordan, Ms. Filing, Mr. Simms, and Patrick when each of these people exhibited significant risk factors for suicide.

**Defendant Summit Psychological Associates breached its legal and contractual duties to make mental-health services accessible to inmates by delaying and denying services to Patrick.**

215.   Summit Psychological Associates provides "behavioral health" and "mental health" services at the Jail pursuant to its contract with the County of Summit Alcohol, Drug Addiction & Mental Health Services Board ("the ADM Board").

216.   In its Funding Application to the ADM Board for the 2021 fiscal year (which included October 2020 when Patrick died), Summit Psychological Associates stated as follows on its "ADM Assurance Statement":

    17.   Services will be available and accessible.
    18.   Services shall be provided in a manner that preserves human dignity.
    19.   Services shall be provided in a manner that assures continuity of care and coordination of all services.

217.   In its Funding Application to the Summit County ADM Board, Summit Psychological Associates described its program for providing mental-health services at the Jail as providing "assessment, individual and group counseling, psychiatric assessment, psychiatric maintenance and case management."

218. The "[t]arget population to be served" identified in the Funding application included adult inmates who needed mental-health services. The "[s]ervice goals, objectives, and performance/outcome indicators include clinical and psychiatric accessibility, the reduction in critical mental health incidents in the jail and the ability to identify mental health needs for first time inmates."

219. In its Funding Application, Summit Psychological Associates represented that there were no delays in providing mental-health services to inmates in the Jail and did not provide the actual length of time inmates had to wait for services in response to questions about wait times.

220. In its Funding Application to the Summit County ADM Board, Summit Psychological Associates stated that psychiatric services were available to Jail inmates "Monday from 1:00pm to 5:00pm; Tuesday 1:00pm to 5:00pm; Wednesday 1:00pm to 5:00pm and Thursday 7:30am to 12:00pm. On-call psychiatry is available 24 hours a day, seven days a week."

221. Summit Psychological Associates also represented in its Funding Application that "telephone interventions are offered to the clients at the time of the emergency and emergency appointments may be offered during hours of operation and depending on the situation…The clinician on-call is responsible for intervening in emergency situations."

222. The subsequent Contract between Summit Psychological Associates and the Summit County ADM Board in effect during Patrick's incarceration and death required Summit Psychological Associates to "provide timely and effective treatment

for people affected by addiction and/or mental health conditions." Contract, § 4.5.9 (attached as Ex. 2).

223.     Summit Psychological Associates was also required by the Contract to "ensure clients have timely and appropriate access to service." *Id*., § 4.7.2.

224.     Summit Psychological Associates was contractually required to "provide services in a manner which minimizes barriers to services and barriers to recovery[.]" *Id*., § 4.5.8.

225.     The contract defined persons with "crisis" needs as those "who may be at imminent risk of harm to self or others, or are in acute distress." *Id*., § 4.7.2(a). For persons with crisis needs, the Contract obligated Summit Psychological Associates to render *immediate* assistance by providing appropriate services. *Id*. The Contract *prohibited* scheduling patients with crisis needs for an appointment in the future or placing them on a waiting list. *Id*.

226.     The Contract defined persons with "urgent" needs as "those who may not be at imminent risk of harm to self or others, but present the clear potential to escalate to a crisis level should assistance not be available." *Id*., § 4.7.2(b). For persons with urgent needs, the Contract required Summit Psychological Associates to provide appropriate services *within 72 hours. Id*. If Summit Psychological Associates could not provide the required services to a patient with urgent needs within 72 hours, it was required to refer the patient to another provider. *Id*.

227.     For persons with "routine" needs, the Contract required Summit Psychological Associates to offer an assessment within five working days of the patient's request or

contact. *Id*., § 4.7.2(c). For these patients who had been assessed, the Contract obligated Summit Psychological Associates to provide services within five days of the assessment. *Id*.

228.  If Summit Psychological Associates could not "engage the person within these timelines, the Provider shall maintain a waitlist and make an appropriate referral to another Provider when prudent." *Id*. For those placed on wait lists, SPA was required to advise them about "the potential length of time they may have to wait to be engaged in a service." *Id*. In the meantime, Summit Psychological Associates was required to offer patients waiting for "interim services" like recovery or peer support. *Id*.

229.  Whether Summit Psychological Associates classified Patrick's needs over the course of his incarceration and as raised in his kites seeking assistance as "crisis," "urgent," or "routine," Summit Psychological Associates repeatedly breached the Contract with the ADM Board by requiring Patrick to wait longer periods of time to receive services.

230.  Summit Psychological Associates also breached the Contract with the ADM Board by failing to inform Patrick of the potential length of time he would have to be on the waitlist and by failing to offer Patrick interim services as his wait time continued.

231.  Summit Psychological Associates' breaches of the Contract with the ADM Board were particularly egregious because Patrick was a member of the "Priority Population" the Contract was intended to benefit.

232.   The Contract between Summit Psychological Associates and the ADM Board defined the Ohio Department of Mental Health and Addiction Services ("OhioMHAS") Priority Population as including "adults with SPMI," "those involved in the justice system," and "dually diagnosed individuals severely medically compromised by their addiction." Contract, § 4.7.2(d).

233.   "SPMI" is "serious and persistent mental illness," and is specifically includes "the serious mental illnesses of…bipolar disorder and other severe forms of depression" and "panic disorder." *Id.*, § 2.37. The Contract required SPA to refer these Priority patients to a "clinically appropriate treatment program as soon as possible." *Id.*, § 4.7.2(d).

234.   Patrick was a member of the OhioMHAS Priority Population because he had serious and persistent mental illnesses, including bipolar disorder, depression, and reported symptoms of panic disorder. Yet Defendant Summit Psychological Associates failed to make services available to him, despite his repeated requests.

**Defendant Summit Psychological Associates failed to abide by its own policies to make mental-health services reasonably accessible to inmates.**

235.   Defendant Summit Psychological Associates' customs and practices likewise violated the promises contained in its own policies that services would be readily accessible to clients within the Jail.

236.   Defendant Summit Psychological Associates' Policy No. 5-2 on Accessibility of Service contained all of the following provisions:

a.   "Summit Psychological Associates, Inc. provides easily accessible and timely care for all of its clients."

b. "Summit Psychological Associates, Inc. is committed to providing clinical services to its client and client agencies on a twenty-four hour basis."

c. "Summit Psychological Associates, Inc. does not currently require a waiting list. Should the need arise for a waiting list for services, the agency shall put in place procedures for maintaining the list."

d. "If a client is not eligible for services sought, the support staff member in conjunction with the Clinical Director, if appropriate, shall offer options for other services at SPA or referrals to outside agencies. Options or referrals shall be made to the client in a timely and understandable manner."

e. "Any restrictions to services, forensic or non-forensic, shall be decided by the Clinical Director if appropriate."

237. Summit Psychological Associates failed to honor Policy No. 5-2 when responding to Patrick's needs and requests for services. These violations of Policy No. 5-2 include, but are not limited to the following actions by Summit Psychological Associates:

a. Failing to provide easily accessible care to Patrick;

b. Failing to provide timely care to Patrick;

c. Failure to providing clinical services to Patrick on a twenty-four-hour basis as needed;

d. Failing to implement waiting-list procedures consistent with its Contract with the ADM Board and/or failing to honor such procedures when interacting with Patrick;

e. Failing to offer options for other services to Patrick;

f. Failing to refer Patrick to an outside agency or service when Summit Psychological Associates was unable to timely respond to his needs and requests for help.

### Defendant Summit Psychological Associates maintained a custom of understaffing psychiatrists.

238.  Ensuring medication services for psychiatric patients is an essential function of Summit Psychological Associates' work in the Jail.

239.  Summit Psychological Associates failed to secure an adequate number of psychiatrists to provide psychiatric care to patients at the Summit County Jail.

240.  It was Summit Psychological Associates' custom and practice to maintain psychiatrist understaffing despite knowing that patients' needs exceeded the capacity of its psychiatric staff.

241.  Summit Psychological Associates had actual notice of the need for more psychiatrists based on kites requesting psychiatric care and the long wait times patients were forced to endure to see a psychiatrist.

242.  When Patrick was in the Summit County Jail, he told his mother that there was only one psychiatrist, who was always about six weeks backed up.

243.  Even when Patrick was given a date certain on which he would next see a psychiatrist, the psychiatrist did not keep that appointment.

244.  On information and belief, Patrick's experience is typical, and his understanding was correct: Summit Psychological Associates did not ensure that enough psychiatrists were available to provide necessary care.

### Summit Psychological Associates violated the Commission on Accreditation of Rehabilitation Facilities' standards.

245.  For the entirety of Patrick's incarceration at the Jail, Summit Psychological Associates was certified by the Commission on Accreditation of Rehabilitation Facilities (CARF) to meet the requirement of Ohio Rev. Code § 5119.361(A)(2).

246. The "primary focus" of CARF's Standards is the requirement for certified organizations to provide "person-centered care throughout the service delivery process" and to treat the persons served "with dignity and respect at all times." (2016 pub, p. 4)

247. Like the Contract with the ADM Board and Summit Psychological Associates' own policies, "numerous" CARF Standards emphasize accessibility to care and "require that, if an organization cannot provide the needed services, referrals to other providers or resources are provided." (2016 pub, p. 4)

248. According to CARF's Quality Practice Notice titled "Suicide Prevention in CARF-Accredited Organizations: Advancing Clinical and Service Workforce Preparedness" (issued September 2016): "Suicide is often the result of multiple risk factors, but not everyone at risk indicates suicidal ideation." (2016 pub, p. 1)

249. "Although some personnel may require more extensive training based on their position, CARF supports and encourages organizations to ensure that suicide prevention is a component of training for all personnel, regardless of their role within the organization." (2016 pub, p. 3)

250. The CARF standards address the key components of suicide prevention, including the following:

- Use of evidence-based practices.
- Ensuring a safe environment.
- Person-centered care.
- Screening and assessment of suicide risk.
- Well-trained and caring staff prepared to intervene.

- Ensuring continuity of care including during and after transition/discharge.
- Ongoing performance improvement.

(2016 pub, p. 9)

251.    CARF Standard 2.B.13 requires certified providers to conduct a person-centered assessment that includes the person's history of trauma.

252.    Standard 2.B.13p requires programs to "look holistically at the risk factors of the person served for suicide, violence, or other risky behaviors. Personnel are encouraged to look across life domains in a thorough clinical assessment to evaluate current intent and plans as well as risk factors that indicate the need for development of a safety plan with the person served."

253.    CARF Standard 2.B.13p(1) requires that suicide assessments evaluate all of the following:

Risk factors:

- Current psychiatric illness/symptoms
- Alcohol and/or other drug use
- Serious physical or emotional pain
- Previous self-harm or suicide attempts
- Suicide attempts or completion in close family/support network
- Age, gender, and social situation
- Relationships that may be supportive/protective or that may pose a threat (abuse or neglect)
- Lack of adequate coping skills/mechanisms
- Financial difficulties
- Access to lethal methods

Current intent and plans:

- Wish to be dead

- Feelings of hopelessness
- Regret/remorse over current/previous attempt
- Expectation about outcome of self-harming behavior or suicide attempt/threat
- Lethargy and frequency of plans or attempts
- Other self-harming behavior
- Current suicide intent/wishes
- Length of time suicidal feelings have been present
- Mental state at time of self-harm or suicide attempt or threat (alcohol or drug intake, social situation, relationship changes, bereavements)
- Plans for others after death, including suicide notes, changes to will, and consequences

254.    CARF Standard 2.C.4 states: "When assessment identifies a potential risk for suicide…a safety plan: (a) Is completed: (1) With the person served. (2) As soon as possible" and "(b) Includes: (1) Triggers, (2) Current coping skills. (3) Warning signs. (4) Actions to be taken. (5) Preferred interventions necessary for: (a) Personal safety."

255.    Defendant Summit Psychological Associates and its employees never completed a safety plan for Patrick, even after he made statements of suicidal ideation on July 22, 2020.

256.    CARF Standard 2.E.8(f) requires a program that prescribes medications to implement written procedures addressing "ongoing reassessment of the current medication profile." This reassessment is intended to balance the risks and benefits of medications, and it includes the following considerations: whether the medication "is having the intended effect," and whether the medication causes "side effects or adverse reactions that need to be addressed," whether the dosage "is appropriate or requires adjustment."

257. Patrick did not receive ongoing reassessments of his medications from an appropriate provider at Summit Psychological Associates.

258. CARF Standard 2.F.7 requires programs to implement written procedures addressing the risk assessment of each person served as to whether seclusion is appropriate. This assessment includes medical history, trauma history, and history of unsafe behaviors to identify risks associated with the use of seclusion and any precautions that should be taken.

259. Summit Psychological Associates did not conduct an appropriate assessment before Patrick was placed in seclusion on October 11, 2020.

260. CARF Standard 4.C.1 requires programs to implement a Comprehensive Suicide Prevention Program (CSPP). CSPPs "work to reduce risk factors and increase protective factors through the implementation of universal, selected, and indicated strategies that address the needs and reflect the culture and environment of the population served."

261. Under CARF Standard 4.C.1, program personnel should receive training on suicide prevention, and "[s]uicide prevention activities must be integrated into numerous community and clinical environments to be successful."

262. Defendant Summit Psychological Associates did not sufficiently integrate suicide-prevention activities into community and clinical environments as required by CARF Standard 4.C.1.

263. CARF Standard 4.C.1(a) requires the CSPP to document an "environmental scan" that includes the following:

(1)     Description of the population served.

(2)     Risk factors present in the population served.

(3)     Protective factors present in the population served.

(4)     Incidents of suicide events in the population served.

(5)     Means of suicide events in the population served.

(6)     Culture(s) of the population served.

(7)     Resources and services available to: (a) Reduce risk factors. (b) Increase protective factors.

(8)     Gaps in resources and services.

(9)     Input from: (a) Persons with lived experience. (b) Other relevant stakeholders.

The CSPP must also be reviewed annually and updated as needed. CARF Standard 4.C.1(b)–(c).

264.   Defendant Summit Psychological Associates did not document an environmental scan and review it annually and update as needed, as required by CARF Standard 4.C.1(a)–(c).

265.   Based on this environmental scan, the CSPP must implement a plan that addresses the needs of persons served and includes "evidence-based prevention activities" for "targeted groups based on risk factors." CARF Standard 4.C.2(a), (c)(1). The CSPP must also include in this plan's evidence-based suicide-prevention activities "indicated strategies" for identifying and assisting persons at risk. CARF Standard 4.C.2(c)(1).

266.   Defendant Summit Psychological Associates did not implement a plan to address the needs of targeted groups based on risk factors using evidence-based prevention activities, as required by CARF Standard 4.C.2(c)(1).

267. The CSPP must include "safety and means reduction strategies" for "targeted groups based on identified risk factors" and individuals at risk. CARF Standard 4.C.2(c)(3).

268. Defendant Summit Psychological Associates did not create a plan that included safety and means-reduction studies for at-risk groups as required by CARF Standard 4.C.2(c)(3).

269. In conjunction with the CSPP, the program must develop a "strategy for stakeholder engagement" that includes "[p]romoting capacity building to address gaps in resources and services." CARF Standard 4.C.3(a).

270. Defendant Summit Psychological Associates did not implement a stakeholder-engagement strategy that addressed gaps in resources and services as required by CARF Standard 4.C.3(a).

271. CARF-certified programs must provide "documented, competency-based training" to personnel about the CSPP at both orientation and regular intervals that includes, at minimum:

    (1)    Suicide risk factors.

    (2)    Suicide protective factors.

    (3)    Suicide concepts and facts.

    (4)    Evidence-informed communication, including safe messaging guidelines.

    (5)    Grief and loss.

    (6)    Issues related to imminent harm.

    (7)    Legal and regulatory considerations for persons at risk for suicide.

    (8)    Means safety.

    (9)    Postvention.

    (10)    Referral process to network resources and services to meet the needs of persons served.

    (11)    Safety planning.

    (12)    Trauma-informed care.

CARF Standard 4.C.6.

272.   Defendant Summit Psychological Associates did not provide training that met the requirements of CARF Standard 4.C.6.

273.   Defendant Summit Psychological Associates did not provide sufficient CARF-compliant training to its employees on means safety and safety planning as required by CARF Standard 4.C.6, as shown by its employees' failure to implement a safety plan or remove means when Patrick displayed risk factors for suicide multiple times during his incarceration. Of note, Summit Psychological Associates did not implement a safety plan when removing Patrick from suicide precautions on July 23, 2020—despite knowing of his subjective suicidal ideation.

274.   Defendant Summit Psychological Associates did not conduct appropriate "postvention" measures as required by CARF Standard 4.C.6 after the prior deaths by suicide in the Jail, including the deaths of Wayne Jordan, Wanda Filing, and Tad Simms. "Postvention" is an organized response to a death by suicide with the goals of facilitating healing among individuals suffering grief and distress from the loss, mitigating other negative effects of exposure to death by suicide, and preventing suicide among high-risk individuals. Although postvention is known to be an essential component of any suicide-prevention training program in the fields of mental health and psychiatry, Summit Psychological Associates did nothing to

address the deaths by suicide of Mr. Jordan, Ms. Filing, and Mr. Simms to prevent future deaths by suicide.

**Defendants Summit County and Summit Psychological Associates failed to secure easily accessible suicide-prevention training for their respective employees.**

275. Suicide-prevention training was readily available and free to both Defendant Summit County and Defendant Summit Psychological Associates.

276. In connection with CARF Standard 4.C.6, the CARF Standards Manual recommended as a training resource a Suicide Prevention Resource Center article titled *Understanding Risk and Protective Factors for Suicide: a Primer for Preventing Suicide*. This article explained the difference between suicide risk factors and suicide warning signs. Whereas risk factors indicate a heightened risk for suicide in an individual or population, warning signs indicate a likely immediate risk of suicide. *Id.* at p. 2.

    a. *Understanding Risk* identified the following risk factors for suicide:

        i. Prior suicide attempt;

        ii. Mood disorders;

        iii. Substance abuse; and

        iv. Access to lethal means.

    b. *Understanding Risk* identified the following warning signs for suicide:

        i. Threatening self-harm or suicide;

        ii. Seeking lethal means;

        iii. Hopelessness;

        iv. Dramatic mood change;

        v. Increasing drug or alcohol abuse.

277.   On both October 11 and 12, 2020, Patrick had all of the risk factors identified in *Understanding Risk* as well as at least two of the warning signs, including hopelessness and dramatic mood change.

278.   One free online training course provided by the National Institute of Corrections, which is referenced by the CARF-recommended Suicide Prevention Resource Center website, is called *Basics and Beyond: Suicide Prevention in Jails*.

279.   The *Basics and Beyond* training, which included a PowerPoint presentation, recorded presentation, and instructor transcript, explained the following concepts necessary for corrections professionals to understand to prevent suicide:

   a.   Jail environments are conducive to suicidal behaviors because they diminish inmates' control, separate inmates from their support networks, provide isolation, and may not have effective mental-health resources.

   b.   Jails tend to be populated by statistically high-risk groups, including young men, people with mental illness, people with substance abuse disorder, and people who previously attempted suicide. (Patrick had all of these characteristics.)

   c.   Other risk factors include depression, alcohol abuse, loss of rational thought, recent divorce, or being in solitary confinement. (Patrick had all of these risk factors.)

   d.   Suicide warning symptoms include depression symptoms, sad mood, loss of interest, disturbed sleep, and loss of appetite.

280.   *Basics and Beyond* specifically refuted the myth that corrections staff have done enough if they ask about suicide and the inmate denies subjective intent. The training explains that individuals communicate suicidal intent in many ways and that appropriate mental-health professionals should examine the person's risk factors to make informed recommendations.

281.  *Basics and Beyond* points out that corrections staff rarely take inmates at face value with self-reported information in the context of alleged crimes or disciplinary offenses but are often too quick to take inmates at their word when they deny suicidal intent. The training explained that inmates' behaviors may demonstrate suicidal ideation when their words cannot. After all, the trainers reasoned, if everyone were able to articulate their suicidal feelings, suicides would be virtually eliminated.

282.  This training detailed several case studies, cautioned against labeling inmates "manipulative," and highlighted that corrections staff cannot rely on inmates' self-reports to assess suicide risk and must assess behavior as well as other sources of information, like reports from other inmates. Deviations from baseline behavior are a common warning sign because many mental illnesses cycle frequently.

283.  *Basics and Beyond* recommends placing at-risk inmates in two-person cells to reduce isolation and privacy and to allow a rescue opportunity. Similarly, it recommends placing at-risk inmates in high-visibility cells and reducing or eliminating the presence of tie-off points.

284.  *Understanding Risk*, *Basics and Beyond*, and any other reasonable suicide-prevention training resource would have alerted Defendant Summit County's corrections employees and Defendant Summit Psychological Associates' mental-health employees to Patrick's suicide risk and the need for interventions to protect him.

## CLAIM 1
## WRONGFUL DEATH
## UNDER OHIO REV. CODE § 2125.01, ET SEQ.
## (AGAINST DEFENDANTS DEMARCO, FEDRICK-FINN, PAULUS-BLAND, AND SUMMIT PSYCHOLOGICAL ASSOCIATES)

285. The wrongful acts and failures to act by Defendants Michael DeMarco, Eric Fedrick-Finn, Ruthann Paulus-Bland, and Summit Psychological Associates (Ms. Paulus-Bland's employer) caused Patrick's death.

### Defendant DeMarco

286. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

287. Defendant DeMarco is liable for Patrick's wrongful death because on October 11, 2020, Patrick told DeMarco he was suicidal, but Defendant DeMarco recklessly refused to place Patrick on suicide precautions, remove lethal means from the cell, request psychiatric care for Patrick, or provide any other assistance to prevent Patrick from dying by suicide.

288. Instead, Defendant DeMarco recklessly took actions to *increase* Patrick's psychiatric distress when Patrick was suicidal, including:

   a. Forcing Patrick back into a cell with a cellmate who—as Defendant DeMarco knew—planned to attack Patrick and then did attack Patrick;

   b. Placing Patrick in lockup (or solitary confinement) on October 11, 2020 after Patrick's cellmate attacked him without removing lethal means from the cell; and

   c. Making a false report that Patrick engaged in fighting based on nonexistent video evidence and despite the fact that Patrick's cellmate corroborated Patrick's account, which caused Patrick to be sentenced to five days of solitary confinement (again, without removing lethal means from the cell).

289.   Defendant DeMarco knew Patrick was at high risk of self-harm and suicide on October 11 and October 12, 2020 because Patrick told Defendant DeMarco he was suicidal on October 11.

290.   Because Patrick told Deputy DeMarco that he was suicidal, Deputy DeMarco actually knew Patrick was at high risk of physical harm and death. Alternatively, a reasonable person in Deputy DeMarco's position who heard an inmate say he was suicidal would have appreciated the high risk that the inmate would suffer physical harm or death when alone in a cell with access to lethal means.

291.   A reasonable officer would have ensured that an inmate who said he was suicidal was placed on suicide precautions or, at a minimum, that lethal means were removed from the suicidal inmate's cell.

292.   Defendant DeMarco knowingly and consciously ignored and disregarded Patrick's obvious risk of suicide, which was evidenced by Patrick's statement of subjective intent and the presence of multiple risk factors and warning signs.

293.   Defendant DeMarco's conscious choice to ignore Patrick's statement of suicidal intent and return him to his cell alone with access to lethal means on October 11, 2020, was beyond negligent and was, at a minimum, reckless—if not willful, wanton, and malicious. Defendant DeMarco demonstrated conscious disregard and indifference to an obvious risk of harm.

294.   Defendant DeMarco again knowingly and consciously ignored and disregarded Patrick's risk of suicide on October 12, 2020 by falsely reporting that Patrick engaged in "fighting" and causing him to be sentenced to five days of solitary confinement.

Defendant DeMarco knew that if Patrick were found guilty of fighting by the sergeant—which was highly likely based on DeMarco's false report—that Patrick would be forced into several additional days of solitary confinement with access to lethal means.

295.  Defendant DeMarco knew his report was false when he wrote it. The knowing falsity is further evidence of DeMarco's intent to knowingly and consciously disregard Patrick's risk of suicide.

296.  A reasonable officer would have known that Defendant DeMarco's actions would cause any incarcerated person to suffer emotional distress. A reasonable officer would have also known that these actions would cause a suicidal person who was in treatment for psychiatric conditions to suffer serious emotional and/or psychiatric distress and increased suicidal ideation.

297.  Although Defendant DeMarco knew or should have known his actions caused Patrick increased psychiatric distress and increased suicidal ideation, Defendant DeMarco placed Patrick in solitary lockup without implementing suicide precautions or removing lethal means from the cell.

298.  Although Defendant DeMarco had actual knowledge that Patrick was suicidal *and* that DeMarco's actions and resulting events caused Patrick increased emotional and psychiatric distress, Defendant DeMarco knowingly and consciously ignored Patrick's serious and substantial risk of suicide.

299.  Defendant DeMarco's actions and failures to act were, at a minimum, reckless—if not wanton and willful or malicious—because DeMarco consciously

disregarded known and obvious risks that Patrick would die by suicide. Defendant DeMarco's conscious disregard was objectively unreasonable and far exceeded negligence.

300. If Defendant DeMarco had ensured that Patrick was placed on suicide precautions after Patrick confessed to suicidal ideation, Patrick would not have died by suicide on October 12, 2020.

301. Deputy DeMarco is not entitled to immunity against this claim under Ohio Rev. Code § 2744.03 because his actions and failures to act were, at minimum, reckless.

302. As a direct and proximate result of Defendant DeMarco's unlawful conduct, Patrick's surviving minor daughter B.B. has suffered and will suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, lost wages and earning capacity, pain and suffering, and lost parental consortium.

303. Plaintiff Shelby Butcher, on behalf of her and Patrick's minor daughter B.B., asks the Court to award economic and non-economic compensatory damages as well as an award of punitive or exemplary damages under Ohio Rev. Code § 2315.21 because Defendant DeMarco's actions indicate malice.

### Defendant Fedrick-Finn

304. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

305. Defendant Fedrick-Finn is liable for Patrick's wrongful death because on October 11, 2020, Patrick told Fedrick-Finn he was suicidal, but Defendant Fedrick-Finn recklessly refused to place Patrick on suicide precautions, remove lethal means

from the cell, request psychiatric care for Patrick, or provide any other assistance to prevent Patrick from dying by suicide.

306.    Instead, Defendant Fedrick-Finn recklessly took actions to *increase* Patrick's psychiatric distress when Patrick was suicidal, including forcing Patrick back into a cell with a cellmate who—as Defendant Fedrick-Finn knew—planned to attack Patrick and then did attack Patrick.

307.    Defendant Fedrick-Finn knew Patrick was at high risk of self-harm and suicide on October 11 and October 12, 2020 because Patrick told Defendant Fedrick-Finn he was suicidal on October 11.

308.    Because Patrick told Deputy Fedrick-Finn that he was suicidal, Deputy Fedrick-Finn actually knew Patrick was at high risk of physical harm and death. Alternatively, a reasonable person in Deputy Fedrick-Finn's position who heard an incarcerated person say he was suicidal would have appreciated the high risk that the person would suffer physical harm or death when alone in a cell with access to lethal means.

309.    A reasonable officer would have ensured that an incarcerated person who said he was suicidal was placed on suicide precautions or, at a minimum, that lethal means were removed from the suicidal person's cell.

310.    Defendant Fedrick-Finn knowingly and consciously ignored and disregarded Patrick's obvious risk of suicide, which was evidenced by Patrick's statement of subjective intent and the presence of multiple risk factors and warning signs.

311.   Defendant Fedrick-Finn's conscious choice to ignore Patrick's statement of suicidal intent and return him to his cell alone with access to lethal means on October 11, 2020, was beyond negligent and was, at a minimum, reckless—if not willful, wanton, and malicious. Defendant Fedrick-Finn demonstrated conscious disregard and indifference to an obvious risk of harm.

312.   A reasonable officer would have known that lockup (solitary confinement) would cause any incarcerated person to suffer emotional distress. A reasonable officer would have also known that lockup would cause a suicidal person who was in treatment for psychiatric conditions to suffer serious emotional and/or psychiatric distress and increased suicidal ideation.

313.   Although Defendant Fedrick-Finn knew or should have known that solitary confinement was not safe for a suicidal person, he did not implement suicide precautions or remove lethal means from the cell.

314.   Defendant Fedrick-Finn knowingly and consciously ignored Patrick's serious and substantial risk of suicide.

315.   Defendant Fedrick-Finn's actions and failures to act were, at a minimum, reckless—if not wanton and willful or malicious—because Fedrick-Finn consciously disregarded known and obvious risks that Patrick would die by suicide. Defendant Fedrick-Finn's conscious disregard was objectively unreasonable and far exceeded negligence.

316.   If Defendant Fedrick-Finn had ensured that Patrick was placed on suicide precautions after Patrick confessed to suicidal ideation, Patrick would not have died by suicide on October 12, 2020.

317.   Deputy Fedrick-Finn is not entitled to immunity against this claim under Ohio Rev. Code § 2744.03 because his actions and failures to act were, at minimum, reckless.

318.   As a direct and proximate result of Defendant Fedrick-Finn's unlawful conduct, Patrick's surviving minor daughter B.B. has suffered and will suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, lost wages and earning capacity, pain and suffering, and lost parental consortium.

319.   Plaintiff Shelby Butcher, on behalf of her and Patrick's minor daughter B.B., asks the Court to award economic and non-economic compensatory damages as well as an award of punitive or exemplary damages under Ohio Rev. Code § 2315.21 because Defendant Fedrick-Finn's actions indicate malice.

**Ruthann Paulus-Bland and Summit Psychological Associates**

320.   Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

321.   Defendant Paulus-Bland, as Assistant Clinical Director for Summit Psychological Associates Jail Services, failed to ensure that Patrick received appropriate mental-health treatment.

322.   During his incarceration at the Jail, Defendant Paulus-Bland failed to ensure that Patrick received regular cognitive behavioral therapy, dialectical behavioral

therapy, or any other type of therapy to help him cope with his mental-health symptoms.

323.   Defendant Paulus-Bland received Patrick's kites pleading for assistance but failed to ensure that Patrick received the mental-health services and psychiatric care he needed—even though it was within her power to ensure that Patrick was scheduled for mental-health services and psychiatric care.

324.   Defendant Paulus-Bland, a licensed independent social worker, had access to Patrick's chart and knew that he had many clinically significant risk factors for suicide.

325.   Defendant Paulus-Bland knew that Patrick said he had choked on his Seroquel on July 20, 2020 and that he had been begging to have it restored after it was taken away. But on October 10, 2020, when Patrick was struggling with extreme morning anxiety and asked the deputies in the Trustee program to switch him to later shifts, Defendant Paulus-Bland urged the deputies not to believe Patrick. She told the deputies that Patrick was "manipulative" and liked to "play games" and that he was caught "cheeking" his medications in July. Defendant Paulus-Bland also told the deputies that Patrick "should not be having any issues with his meds," which was a conclusion outside the scope of her practice and licensure. Yet she knew the deputies would believe her.

326.   Defendant Paulus-Bland also demonstrated malice against Patrick on October 10 by telling the deputies that "if he can't work AM [morning] he can be removed as he is playing games and trying to manipulate." She knew or should have known that

the Trustee program offered Patrick valuable methods of coping with his mental-health symptoms and that it was important for him to stay in the program, but she nonetheless intentionally disparaged him to the Trustee-program deputies and suggested that he be removed.

327.  On October 12, 2020, Defendant Paulus-Bland knew that Patrick had been kicked out of the Trustee program three days earlier and that he had been attacked by his cellmate the day before.

328.  On October 12, 2020, Defendant Paulus-Bland knew that losing a job and being subjected to physical violence were risk factors for suicide.

329.  Despite receiving Patrick's kites seeking psychiatric help, and despite her knowledge of the risk factors for suicide, Defendant Paulus-Bland sent an unlicensed psychology intern, Jamie Giglio, to see Patrick *alone* on October 12, 2020 in response to his kites seeking medication adjustments.

330.  Defendant Paulus-Bland knew or should have known that Patrick's symptoms were clinical psychiatric symptoms and that his requests for medication assistance required psychiatric attention. But she sent someone to see him who was utterly unqualified to address his problems.

331.  Defendant Paulus-Bland knew or should have known that Ms. Giglio was only qualified to see Patrick when supervised by a licensed psychologist, as required by Ohio law, but Paulus-Bland sent Ms. Giglio to see Patrick alone.

332.  If Defendant Paulus-Bland had sent a properly trained or licensed clinical provider to evaluate Patrick on October 12, 2020, he would have been placed on

suicide watch based on his objective risk factors and warning signs and would not have died by suicide on October 12, 2020.

333.   If Defendant Paulus-Bland had utilized her authority as Assistant Clinical Director for Jail Services to ensure that Patrick received timely and consistent psychiatric care and mental-health services (as required by the Contract between her employer Summit Psychological Associates and the ADM Board) during the course of his incarceration, Patrick would not have died by suicide on October 12, 2020.

334.   If Defendant Paulus-Bland had utilized her authority as Assistant Clinical Director for Jail Services to ensure that Jail staff (including employees of Summit Psychological Associates and Summit County) received proper training on suicide prevention as required by law, by Summit Psychological Associates policies, and by the Contract between her employer Summit Psychological Associates and the ADM Boar, Patrick would not have died by suicide on October 12, 2020.

335.   To the extent that Defendant Paulus-Bland urges that she is entitled to immunity under Ohio Rev. Code § 2744.03 as the employee of a political subdivision's contractor, § 2744.03 does not provide immunity to government contractors' employees. Even if it did, it would not confer immunity upon Defendant Paulus-Bland because her actions and failures to act were, at minimum, reckless.

336.   As a direct and proximate result of Defendant Paulus-Bland's unlawful conduct, Patrick's surviving minor daughter has suffered and will suffer economic and non-economic damages for which this Defendant is liable, including, but not

limited to, lost wages and earning capacity, pain and suffering, and lost parental consortium.

337.   Plaintiff Shelby Butcher, on behalf of her and Patrick's minor daughter B.B., asks the Court to award economic and non-economic compensatory damages as well as an award of punitive or exemplary damages under Ohio Rev. Code § 2315.21 because Defendant Paulus-Bland's actions indicate malice.

### B.B.'s damages from Patrick's wrongful death

338.   As Patrick's sole surviving child and next of kin, B.B. is presumed to have suffered damages from Patrick's wrongful and premature death.

339.   B.B. has suffered damages and will continue to suffer damages proximately caused by Defendants' actions. These damages include but are not limited to:

   a. Loss of support from Patrick's reasonably expected earning capacity;

   b. Loss of services;

   c. Loss of society, including loss of companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education; and

   d. Mental anguish.

340.   Plaintiff Shelby Butcher, on behalf of her and Patrick's minor daughter B.B., asks the Court to award all such damages as well as punitive or exemplary damages against one or all of these individual Defendants for the benefit of B.B.

## CLAIM 2
### SURVIVAL CLAIM: NEGLIGENCE
### (AGAINST DEFENDANTS DEMARCO, FEDRICK-FINN, PAULUS-BLAND, GIGLIO, AND SUMMIT PSYCHOLOGICAL ASSOCIATES)

### Defendant DeMarco

341. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

342. Defendant DeMarco breached his statutory and common-law duties to Patrick, specifically including DeMarco's general duty of care, and caused Patrick pre-death pain and suffering, in all of the following respects:

    a. Failing to place Patrick on suicide precautions on either October 11 or October 12, 2020, causing Patrick increased mental anguish and physical pain from the pre-death injuries caused by his means of death;

    b. Forcing Patrick into his cell with an inmate who predictably attacked him, causing Patrick physical and emotional injuries;

    c. Making a false report that Patrick was engaged in fighting, causing Patrick extreme mental anguish from being disbelieved and unfairly punished and from enduring solitary confinement; and

    d. Forcing an inmate known to be suicidal into solitary confinement with access to lethal means.

343. Defendant DeMarco's actions and failures to act were, at a minimum, reckless—if not wanton and willful or malicious—because DeMarco consciously disregarded known and obvious risks that Patrick would suffer physical and emotional injury based on Patrick telling him that his cellmate would attack and that he was suicidal. Defendant DeMarco's conscious disregard was objectively unreasonable and far exceeded negligence.

344.   Deputy DeMarco is not entitled to immunity under Ohio Rev. Code § 2744.03 as the employee of a political subdivision because his actions and failures to act were, at minimum, reckless.

345.   As a direct and proximate result of Defendant DeMarco's unlawful conduct, Patrick suffered damages for which this Defendant is liable to Patrick's estate, of which Plaintiff Terry DeVos is administratrix, including, but not limited to, mental, emotional, and physical pain and suffering.

346.   Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant as well as punitive or exemplary damages because the Defendant's actions indicate malice.

### Defendant Fedrick-Finn

347.   Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

348.   Defendant Fedrick-Finn breached his statutory and common-law duties to Patrick, specifically including Fedrick-Finn's general duty of care, and caused Patrick pre-death pain and suffering, in all of the following respects:

    a.  Failing to place Patrick on suicide precautions on either October 11 or October 12, 2020, causing Patrick increased mental anguish and physical pain from the pre-death injuries caused by his means of death;

    b.  Forcing Patrick into his cell with an inmate who predictably attacked him, causing Patrick physical and emotional injuries;

    c.  Forcing an inmate known to be suicidal into solitary confinement with access to lethal means.

349. Defendant Fedrick-Finn's actions and failures to act were, at a minimum, reckless—if not wanton and willful or malicious—because Fedrick-Finn consciously disregarded known and obvious risks that Patrick would suffer physical and emotional injury based on Patrick telling him that his cellmate would attack and that he was suicidal. Defendant Fedrick-Finn's conscious disregard was objectively unreasonable and far exceeded negligence.

350. Deputy Fedrick-Finn is not entitled to immunity under Ohio Rev. Code § 2744.03 as the employee of a political subdivision because his actions and failures to act were, at minimum, reckless.

351. As a direct and proximate result of Defendant Fedrick-Finn's unlawful conduct, Patrick suffered damages for which this Defendant is liable to Patrick's estate, of which Plaintiff Terry DeVos is administratrix, including, but not limited to, mental, emotional, and physical pain and suffering.

352. Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant as well as punitive or exemplary damages because the Defendant's actions indicate malice.

### Defendants Paulus-Bland and Summit Psychological Associates

353. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

354. Defendant Summit Psychological Associates employed Ruthann Paulus-Bland for the duration of Patrick's 2020 incarceration at the Summit County Jail. Defendant Paulus-Bland acted within the course and scope of her employment at all times when

interacting with Patrick. Summit Psychological Associates is thus liable for Ms. Paulus-Bland's negligence under the doctrine of *respondeat superior*.

355. Defendant Paulus-Bland breached her statutory and common-law duties of care to Patrick in the following respects:

a. Failing to ensure that he received timely psychiatric care, including after his requests for medication adjustments;

b. Failing to ensure that Patrick received care from a psychiatrist within three days of Patrick evidencing crisis or urgent needs as required between the contract between Summit Psychological Associates and the ADM Board;

c. Failing to refer Patrick to another psychiatrist when the Summit Psychological Associates psychiatrists were not available for more than five days as required between the contract between Summit Psychological Associates and the ADM Board;

d. Never calling the on-call psychiatrist to address Patrick's needs;

e. Failing to inform Patrick of the wait time to see a psychiatrist;

f. Failing to ensure that Patrick saw a psychiatrist between August 27, 2020 and his death, despite receiving Patrick's many kites seeking assistance from a psychiatrist over that six-week period;

g. Failing to provide Patrick interim services during his wait to see a psychiatrist, including but not limited to cognitive behavioral therapy or dialectical behavioral therapy;

h. Maliciously and falsely telling Sheriff's deputies that Patrick "liked to play games," was "cheeking his meds in July," "should not be having any issues with his meds," and that "if he can't work AM [morning] he can be removed as he is playing games and trying to manipulate," causing Patrick to be removed from the Trustee program when she knew or should have known that working was a helpful coping mechanism; and

i. Failing to send a properly qualified or licensed mental-health provider to respond to Patrick's kites seeking medication services on October 12, 2020.

356. Defendant Summit Psychological Associates is not a political subdivision as defined in Ohio Rev. Code § 2744.01(F). When Defendant Paulus-Bland breached her duties to Patrick, causing him damages, she was employed by Summit Psychological Associates, not a political subdivision. Contractors do not fall within the definition of political-subdivision "employees" under Ohio Rev. Code § 2744.01(B). As a result, Defendant Summit Psychological Associates and Ms. Paulus-Bland are not entitled to the immunities afforded to political subdivisions and their employees by Ohio Rev. Code § 2744.01, *et seq*.

357. As a direct and proximate result of Defendant Paulus-Bland's unlawful conduct, Patrick suffered damages for which this Defendant is liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

358. Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant as well as punitive or exemplary damages because the Defendant's actions indicate malice.

**Defendant Giglio and Summit Psychological Associates**

359. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

360. On October 12, 2020, Defendant Jamie Giglio was an unlicensed psychology intern working for Summit Psychological Associates but saw Patrick with no licensed psychologist present.

361.    Defendant Giglio knew or should have known on October 12, 2020 that she was required by law to provide patient services in a supervised setting with a licensed psychologist.

362.    Defendant Giglio took no action on October 12, 2020 to ensure that a licensed psychologist serving as her supervisor "clearly informed" Patrick of "the relationship between the supervisor and the supervisee, and their respective legal and professional responsibilities for the services rendered to or received by the client" as required by Ohio Adm. Code § 4732-13-04(12).

363.    Defendant Giglio took no action on October 12, 2020 to ensure that a licensed psychologist acting as her supervisor informed Patrick of "the supervised nature of the work of the supervisee, and of the ultimate professional responsibility of the supervisor…in the form of a written statement" as also required by Ohio Adm. Code § 4732-13-04(12).

364.    Defendant Giglio acted outside the bounds of her legal authority as an intern by seeing Patrick alone. She breached her general duty of care and statutory duty to the public by seeing a patient without supervision.

365.    Defendant Giglio assumed a duty to provide competent mental healthcare and psychological services by presenting herself as a mental-health and psychology professional.

366.    Defendant Giglio breached her duty to provide competent mental healthcare and psychological services in the following ways:

> a. Defendant Giglio failed to take action to address the fact that Patrick had been on a waiting list to see a psychiatrist since August 27, 2020, or

for about six weeks, which she knew or should have known was far longer than the waiting list was supposed to be;

b.  Defendant Giglio failed to take action to address Patrick's symptoms of "increased mood swings and anxiety," "heart racing," "racing thoughts," nausea, and feeling "tingly;"

c.  Defendant Giglio failed to take action to address Patrick's symptoms of hopelessness as shown by his statement that suggested coping skills did not work;

d.  Defendant Giglio failed to see Patrick in a private setting conducive to productive counseling or evaluation; and

e.  Defendant Giglio failed to consider Patrick's objective risk factors for suicide.

367.  By purporting to provide mental healthcare and psychological services when she knew she was not licensed or qualified to do so, and by negligently performing these assumed duties, Defendant Giglio violated the trust inherent in the special relationship between mental-healthcare provider and patient and caused Patrick to suffer damages, including but not limited to extreme mental anguish, pain, and suffering.

368.  As a direct and proximate result of Defendant Giglio's unlawful conduct, Patrick suffered damages for which this Defendant is liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

369.  Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant as well as punitive or exemplary damages because the Defendant's actions indicate malice.

## CLAIM 3
### SURVIVAL CLAIM: NEGLIGENT FAILURE TO PROTECT
### (AGAINST DEFENDANTS DEMARCO AND FEDRICK-FINN)

370.    Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

371.    As corrections officers, Defendants DeMarco and Fedrick-Finn had a duty under Ohio law to exercise reasonable care to protect Patrick from unreasonable risks of physical harm. When corrections officers become aware of a dangerous condition, including an impending assault, they must take reasonable care to prevent injury to the inmate.

372.    Defendants DeMarco and Fedrick-Finn had actual notice from Patrick that Patrick's cellmate intended to violently assault him for snitching on the cellmate's fellow gang member.

373.    Defendants DeMarco and Fedrick-Finn breached their duty of care to protect Patrick from unreasonable risks of harm because they received actual notice of the impending attack but took no protective action. Instead, they placed Patrick in harm's way by sending him back to his cell, where he would be alone with the person who wanted to attack him.

374.    Defendants DeMarco and Fedrick-Finn's breach of their duty of care—sending Patrick into harm's way—directly and proximately caused Patrick to be attacked by his cellmate.

375.    As a result of being attacked by his cellmate, Patrick experienced physical and emotional pain and suffering.

376.    As a direct and proximate result of Defendants DeMarco and Fedrick-Finn's unlawful conduct, Patrick suffered damages for which these Defendants are liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

377.    Defendants DeMarco and Fedrick-Finn are not entitled to immunity under Ohio Rev. Code § 2744.03 because their actions and failures to act were, at minimum, reckless.

378.    As a direct and proximate result of these Defendants' unlawful conduct, Patrick suffered damages for which these Defendants are liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

379.    Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against these Defendants as well as punitive or exemplary damages because the Defendants' actions indicate malice.

### CLAIM 4
### FOURTEENTH AND/OR EIGHTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR FAILURE TO PROTECT (AGAINST DEFENDANTS DEMARCO AND FEDRICK-FINN)

380.    Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

381.    Federal law, including the Eighth and Fourteenth Amendments,[2] imposes a

---

[2] Patrick's rights should arise under the Fourteenth Amendment because even though he had entered a plea and been adjudicated guilty, he had not yet been sentenced. Eighth Amendment claims are included in the alternative. *See Graham v. Connor*, 490 U.S. 386, 393, n. 6 (1989), citing *Ingraham v. Wright*, 430 U.S. 651, 671, n. 40 (1977).

duty on corrections officers to protect inmates from violence at the hands of fellow inmates. *Wilson v. Yaklich*, 148 F.3d 596, 600 (6th Cir. 1994).

382.   Patrick's injuries were objectively substantial because his cellmate beat him. On information and belief, this caused contusions. It also caused Patrick's fragile emotional and mental state to suffer.

383.   The risk that Patrick would incur injuries at the hands of his cellmate after Patrick snitched on his cellmate's fellow gang member was substantial.

384.   Defendants DeMarco and Fedrick-Finn knew about the risk that Patrick's cellmate would attack Patrick because Patrick told them his cellmate would attack him.

385.   Defendants DeMarco and Fedrick-Finn knew Patrick was in imminent danger of violent retaliation from his cellmate.

386.   As of October 11, 2020, Defendants DeMarco and Fedrick-Finn knew that, as a matter of Jail culture, gang members retaliated against snitches on behalf of their fellow gang members.

387.   Despite knowing that Patrick faced a substantial risk of being attacked by his cellmate if he were forced to re-enter his cell, Defendants DeMarco and Fedrick-Finn disregarded this risk and forced Patrick into his cell with his would-be attacker.

388.   Shortly after Defendants DeMarco and Fedrick-Finn forced Patrick back into his cell with his cellmate, Patrick's cellmate attacked Patrick.

389.   Defendants DeMarco and Fedrick-Finn's breach of their constitutional duties to protect Patrick from foreseeable harm at the hands of other inmates proximately

caused Patrick to be attacked and injured by his cellmate, thereby proximately causing Patrick to suffer damages for physical injuries and pain and suffering.

390.  As of October 11, 2020, it was clearly established within the Sixth Circuit that corrections officers have a duty to protect inmates from being attacked by other inmates. *Farmer v. Brennan,* 511 U.S. 825, 833 (1994); *Wilson v. Yaklich,* 148 F. 3d 596, 600 (6th Cir. 1994). Defendants DeMarco and Fedrick-Finn violated this clearly established law by placing Patrick in harm's way despite actual knowledge of the substantial risk that Patrick's cellmate would hurt Patrick.

391.  Given these facts, there can be no good-faith argument under the clearly established law that Defendants DeMarco and Fedrick-Finn are entitled to qualified immunity against this claim.

392.  As a direct and proximate result of Defendants DeMarco's and Fedrick-Finn's unlawful conduct, Patrick suffered damages for which these Defendants are liable to Patrick's estate, of which Terry DeVos is administratrix, including, but not limited to, mental, emotional, and physical pain and suffering.

393.  Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against these Defendants.

### CLAIM 5
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983 FOR DELIBERATE INDIFFERENCE TO PATRICK BUTCHER'S SERIOUS MEDICAL AND PSYCHIATRIC NEEDS (AGAINST DEFENDANTS DEMARCO AND FEDRICK-FINN)

394.  Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

395. The Constitution prohibits corrections employees from acting with "deliberate indifference" to incarcerated people's serious medical needs. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). Corrections employees' deliberate indifference violates an incarcerated person's constitutional rights when they intentionally deny or delay a person's access to medical care for a serious medical need. *Id.*, citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

396. Corrections officials who have "been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

397. Deliberate indifference includes delays in providing medical care when a layperson would recognize that the plaintiff's medical condition obviously required a doctor's attention. *Blackmore* at 899–90.

398. The legal standard for proving deliberate indifference to medical needs requires proof of two elements: (1) the inmate had an objectively serious medical need imposing a "substantial risk of serious harm" and (2) a corrections employee or medical provider subjectively knew about the inmate's serious medical need but disregarded it or responded unreasonably. *Troutman v. Louisville Metro Dept. of Corr.*, 979 F.3d 472, 482–83 (6th Cir. 2020), quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

399. The risk of suicide is an objectively serious medical need that satisfies the first element of deliberate indifference. *Estate of Clark v. Walker*, 865 F.3d 544, 553 (6th Cir. 2017).

400.    The second element of deliberate indifference is met when it was "obvious that there was a 'strong likelihood' that an inmate would attempt suicide." *Troutman*, 979 F.3d at 483, quoting *Downard for Est. of Downard v. Martin*, 968 F.3d 594. A plaintiff can carry the burden of proof for this second element by showing that the inmate had recently expressed a desire to engage in self-harm. *Id.*, citing *Downard* at 601.

401.    When a corrections official actually knew about an inmate's serious risk of suicide but did nothing, the corrections officer's "particular conduct" violates clearly established law and is deliberately indifferent. *Estate of Clark*, 865 F.3d at 553.

402.    Here, Patrick told Defendant DeMarco and Defendant Fedrick-Finn that he (Patrick) was suicidal on October 11, 2020, the day before he died by suicide. But they did nothing.

403.    In addition to Patrick's statement of suicidal ideation, Patrick had a number of risk factors for suicide of which Defendants DeMarco and Fedrick-Finn knew or should have known, including: his current psychiatric medications, his recent attack from his cellmate, his recent removal from Trustee status, and his upcoming sentencing.

404.    Despite actual knowledge that Patrick was suicidal, Defendant DeMarco and Defendant Fedrick-Finn did not place Patrick on suicide precautions, remove the means for Patrick to self-harm from the cell, request that Patrick be moved to the mental-health pod, seek psychiatric assistance from the on-call psychiatrist, seek assistance from behavioral-health staff, or ensure that Patrick received more frequent monitoring.

405.    Instead, Defendant DeMarco and Defendant Fedrick-Finn forced Patrick, who was suicidal, to return to his cell with a cellmate who intended to beat him up.

406.    Defendant DeMarco's and Defendant Fedrick-Finn's refusal to seek immediate psychiatric assistance for Patrick when they knew he was suicidal demonstrated their deliberate indifference to Patrick's risk of suicide as a matter of law. *Bays v. Montmorency Cty.*, 874 F. 3d 264, 270 (6th Cir. 2017).

407.    Defendant DeMarco's deliberate indifference continued after Patrick's cellmate violently attacked him on October 11, 2020, as Patrick had feared. Even though all evidence indicated that Patrick did not fight back against his cellmate (including the cellmate's own admission), Defendant DeMarco reported that Patrick was fighting, causing Patrick to be disciplined and sentenced to five days of solitary lockup. Defendant DeMarco thus knowingly and intentionally caused a person who was suicidal to be alone in his cell for 23 hours per day for five days—again, without placing him on suicide precautions or removing lethal means from the cell.

408.    As a direct and proximate result of Defendants DeMarco's and Fedrick-Finn's unlawful conduct, Patrick suffered damages for which these Defendants are liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

409.    Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against these Defendants as well as punitive or exemplary damages because Defendants' conduct evidenced malicious intent to cause Patrick harm.

**CLAIM 6**

**EIGHTH AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C.
§ 1983 FOR A DELIBERATELY INDIFFERENT FAILURE TO TRAIN AND
SUPERVISE CORRECTIONS OFFICERS WITHIN THE JAIL REGARDING
THE LEGITIMATE MEDICAL NEEDS OF INMATES WITH SERIOUS MENTAL
ILLNESSES AND/OR A CUSTOM OR POLICY OF DELIBERATE
INDIFFERENCE TO THE LEGITIMATE MEDICAL NEEDS OF INMATES
WITH SERIOUS MENTAL ILLNESSES
(AGAINST SUMMIT COUNTY)**

410. Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

### Deliberately indifferent failure to train on suicide prevention

411. Defendant Summit County did not provide suicide-prevention training to the Sheriff's deputies working in the Jail as required by law and the Sheriff's own Policy 11.7.1.

412. Defendant Summit County had actual notice of the need for suicide-prevention training. The County received notice of the need to conduct suicide-prevention training from all of the following sources:

    a. Ohio Adm. Code § 5120:1-8-09(N)(2), which required such training as an "essential" standard;

    b. Its own Policy 11.7.1;

    c. Communications of deficiencies from the Ohio Department of Rehabilitation and Corrections inspector; and

    d. The prior inmate deaths by suicide, attempts to die by suicide, and suicidal gestures upon which Summit County was required to report.

413. Even after Wayne Jordan, Wanda Filing, and Tad Simms died by suicide in the Jail, Defendant Summit County failed to ensure its corrections staff received this legally required suicide-prevention training.

414.    The need for Defendant Summit County to provide suicide-prevention training to corrections staff was obvious, but the Defendant County inexplicably chose not to provide such training, demonstrating deliberate indifference to suicide-prevention needs.

415.    Based on the fact that Defendant DeMarco, Defendant Fedrick-Finn, and several other deputies heard Patrick say he was suicidal but did not place him on suicide precautions, it may also be inferred that Summit County did not provide any informal training or supervision to its employees about how to respond to an incarcerated person's statement of suicidal ideation. If Summit County had provided such training, it is likely that one or more of the deputies present would have acknowledged the significant risk and taken some action to prevent Patrick's death.

416.    In the several years preceding Patrick's death, the Summit County Sheriff (then-Sheriff Barry) repeatedly decided not to require initial and annual suicide-prevention training as required by Ohio Adm. Code § 5120:1-8-09(N)(2), even after the prior deaths by suicide and attempted deaths by suicide described above, and even after the ODRC Inspector advised the Sheriff of the need to implement a policy to effectuate this legal requirement and, subsequently, the need to provide documentation of compliance. The Sheriff held final policymaking authority for training Summit County Sheriff's deputies, and his decisions to forego the necessary training constituted the official policy of Summit County and confer municipal liability under 42 U.S.C. § 1983.

417.    The Summit County Sheriff's failure to require suicide-prevention training as required by Ohio Adm. Code § 5120:1-8-09(N)(2) extended into the year Patrick died, 2020. Approximately eight months before Patrick's death, the ODRC Inspector notified the Sheriff that he needed to document compliance with Ohio Adm. Code § 5120:1-8-09(N)(2), on February 4, 2020. Less than two weeks after this warning, Mr. Simms died by suicide on February 16, 2020. Yet the Sheriff implemented no training or policy reforms to address this urgent problem before October.

### Custom of deliberate indifference to risk of suicide

418.    Under federal law, the risk of suicide is an objectively serious medical need. *Estate of Clark v. Walker*, 865 F.3d 544, 553 (6th Cir. 2017).

419.    When a corrections officer knows that an incarcerated person is at serious risk of suicide but does nothing, the corrections officer's conduct constitutes deliberate indifference. *Estate of Clark v. Walker*, 865 F.3d 544, 553 (6th Cir. 2017).

420.    Summit County had a custom of allowing Sheriff's deputies in the Jail to disregard incarcerated people's statements of suicidal ideations.

421.    Defendant DeMarco and Defendant Fedrick-Finn heard Patrick say he was suicidal but took no action besides placing him back in his cell. Based on the shared reaction from approximately five deputies, it may be inferred that the Summit County Sheriff's deputies were accustomed to disregarding the risks posed by such statements.

422.    Detective Jason Kline's investigation corroborates the existence of this custom by shrugging off Patrick's suicidal indications as attempts to manipulate deputies—

even though, of course, Detective Kline knew by this time that Patrick had actually died by suicide.

423.    The actions of Defendant DeMarco, Defendant Fedrick-Finn, and the other deputies who heard Patrick say he was suicidal, and the actions and statements of Detective Kline, demonstrate that the Summit County Sheriff's department had a custom of vesting deputies with substantial discretion to make subjective determinations about incarcerated people's psychiatric needs.

424.    Deaths by suicide that occurred in the Jail before Patrick's death demonstrate the existence of a custom of deliberate indifference in the Jail. The deaths by suicide of Wayne Jordan, Wanda Filing, and Tad Simms constitute prior incidents demonstrating the County's customs of ignoring objective suicide risk factors.

425.    The death by suicide of Ms. Filing demonstrates the County's officers' custom of ignoring statements of suicidal ideation by incarcerated people.

426.    The prior deaths by suicide and attempted deaths by suicide in the Jail demonstrate the County's custom of failing to remove lethal means from the cells of people with risk factors for suicide.

427.    The prior deaths by suicide and attempted deaths by suicide in the Jail demonstrate the County's custom of ignoring the need to reform its policies, procedures, practices, and training based on analyses of the circumstances that led to deaths or nearly led to deaths of people in its custody.

### Policy of deliberate indifference to incarcerated people's mental-health and psychiatric needs

428.   At the behest of then-Summit County Council District 5 Representative David Hamilton, Summit County Council convened the Summit County Jail Advisory Commission in 2017.

429.   The Commission's August 14, 2018 Report and Recommendations contained targeted recommendations to improve incarcerated people's mental health in the Jail, including by improving their access to mental-health services in the following ways:

   a. "Support and work on universal release of information—gives people permission to share private health information exception to HIPAA Laws;"

   b. "Provide additional mental health beds at the Jail" to "take better suicide precautions and decrease the risk of suicides in jail by inmates."

   c. "Increase staffing on Mental Health Unit;"

   d. "Technology Improvements for Mental Health records software;"

   e. "Improve mental health service access to inmates" to allow more opportunities for counseling, including by "[c]reating separate rooms for individual meetings with inmates and staff/counselors" because "[l]arge open spaces where counselors talk to inmates are less private and not conducive to counselor and inmate meetings."

430.   Despite receiving the Commission's Report and Recommendations, both the County Executive and County Council made the conscious decision to deprioritize the mental health of the people in County custody in favor of increased security measures, like more surveillance cameras.

431.   The County Executive and County Council hold final policymaking authority for Summit County. Because Defendant Summit County's final policymakers made decisions to reject the Commission's recommendations to improve the mental health

of incarcerated people at the Jail, their decisions confer municipal liability under 42 U.S.C. § 1983.

432.    As a direct and proximate result of the County's failure to train, custom, and policy as set forth above, Patrick suffered damages for which these Defendants are liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

433.    Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant.

**CLAIM 7**
**EIGHTH AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C.**
**§ 1983 FOR A CUSTOM OF DELIBERATE INDIFFERENCE TO**
**INCARCERATED PEOPLE'S SERIOUS PSYCHIATRIC NEEDS AND FAILURE**
**TO TRAIN EMPLOYEES REGARDING SERIOUS PSYCHIATRIC NEEDS**
**(AGAINST DEFENDANT SUMMIT PSYCHOLOGICAL ASSOCIATES)**

434.    Plaintiffs incorporate by reference the factual allegations of the preceding paragraphs (¶¶ 1–284).

435.    The risk of suicide is an objectively serious medical need. *Estate of Clark v. Walker*, 865 F.3d 544, 553 (6th Cir. 2017).

436.    Psychiatric conditions requiring medication are objectively serious medical needs. *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018).

437.    Patrick, who had been diagnosed with chronic PTSD, major depressive order, and bipolar disorder, had a clearly established right to have his psychiatric illness "treated seriously." *Bays v. Montmorency Cty.*, 874 F. 3d 264, 270 (6th Cir. 2017).

438. In response to Patrick's kites seeking psychiatric treatment, Summit Psychological Associates employees repeatedly told Patrick that they did not know when a doctor could see him.

439. In response to Patrick's kites seeking adjustments to psychiatric medication or other medication services, Summit Psychological Associates repeatedly delayed providing these services.

440. Scheduling an appointment for "weeks in the future" for a patient who exhibits symptoms requiring immediate or near-immediate psychiatric care supports a finding of deliberate indifference. *Bays*, 874 F. 3d at 270.

441. Summit Psychological Associates occasionally sent a social worker or intern to speak with Patrick. Although counseling by a non-medical professional may sometimes serve as a supplement to psychiatric care, it is not a substitute for psychiatric evaluation, medication, and care by a qualified and licensed clinician. Providing non-medical care to an inmate with serious psychiatric needs is not enough. As the Sixth Circuit has recognized, "[a]lthough officials can avoid constitutional liability by addressing the inmate's serious need, they cannot escape a deliberate-indifference claim by fetching a band-aid if the inmate is hemorrhaging." *Finley v. Huss*, 723 F. App'x 294, 298 (6th Cir. 2018), citing *Bays*, 874 F.3d at 269 and *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014).

442. Summit Psychological Associates' offer of non-medical services does not preclude a finding of deliberate indifference. Social workers and psychologists (and

psychology interns) cannot provide psychiatric medical care or adjust medications, which is what Patrick requested and required.

443. Defendant Summit Psychological Associates' conduct toward Patrick evidenced a custom of failing to honor its legal and contractual obligations as well as its obligations under its licensing authority, CARF. Defendant Summit Psychological Associates failed to provide reasonably timely or accessible services to Patrick and failed to properly train its employees, demonstrating its deliberate indifference to his psychiatric conditions and risk of suicide.

444. Defendant Summit Psychological Associates failed to train its employees to adhere to its contractual obligations, as set forth in the Contract with the ADM Board.

445. Defendant Summit Psychological Associates failed to provide adequate suicide-prevention training to its employees, as evidenced by its employees repeatedly ignoring Patrick's clear and obvious risk factors for suicide. The need for mental-health professionals to have training on detecting objective signs of suicide risk is obvious.

446. As a direct and proximate result of Summit Psychological Associates' failure to train, custom, practices, and policy as set forth above, Patrick suffered damages for which this Defendant is liable to Patrick's estate, including, but not limited to, mental, emotional, and physical pain and suffering.

447. Plaintiff Terry DeVos, on behalf of Patrick's estate, asks the Court to award the estate economic and non-economic compensatory damages against this Defendant

as well as punitive or exemplary damages because Defendant's conduct evidenced malicious intent to cause Patrick harm.

## PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

A.  Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, and of 42 U.S.C. § 1983 and state law;

B.  Enter judgment in Plaintiffs' favor on all claims for relief;

C.  Award full compensatory damages to Patrick's estate including, but not limited to, damages for bodily injury, pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Butcher suffered;

D.  Award full compensatory damages to B.B. for the wrongful death of her father including but not limited to lost wages and earning capacity, pain and suffering, and lost parental consortium;

E.  Award punitive and exemplary damages for the egregious, willful, and malicious conduct of the individual Defendants and Summit Psychological Associates;

F.  Award pre- and post-judgment interest at the highest lawful rate;

G.  Award Plaintiffs reasonable attorneys' fees and all other costs of suit; and

H.  Award all other relief in law or equity, including injunctive relief, to which Plaintiffs are entitled and that the Court deems equitable, just, and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Dated: September 2, 2022          Respectfully submitted,


/s/Jessica S. Savoie
Ashlie Case Sletvold (0079477)
Jessica S. Savoie (0099330)
**PEIFFER, WOLF, CARR, KANE
  CONWAY & WISE, LLP**
6370 SOM Center Road, Suite 108
Cleveland, Ohio 44139
Phone: (216) 589-9280 / Fax (216) 258-0161
asletvold@peifferwolf.com
jsavoie@peifferwolf.com

*Counsel for Plaintiffs Terry DeVos, as
Administratrix of Estate of Patrick Butcher,
and Shelby Butcher, as Natural Mother and
Guardian of B.B., Sole Surviving Child of
Patrick Butcher*